Walker **CHANDLER**, Plaintiff–Appellee,

Carole Ann Rand,
Intervenor–Plaintiff, Appellee,

v.

**GEORGIA PUBLIC TELECOMMUNICATIONS COMMISSION, et al.,**
Defendants–Appellants,

**Atlanta Journal and Atlanta Constitution, Intervenors–Defendants, Appellants.**

No. 90–8968.

United States Court of Appeals,
Eleventh Circuit.

Oct. 31, 1990.

Terrence B. Adamson, James A. Demetry, Peter C. Canfield, Dow, Lohnes & Albertson, Atlanta, Ga., for Atlanta Journal.

Nancy M. Gallagher, Asst. Atty. Gen., Michael E. Hobbs, Atlanta, Ga., for Georgia Public Telecommunications Com'n.

Walker L. Chandler, Zebulon, Ga., pro se.

Michael A. Dominy, Jackson & Tyler, Atlanta, Ga., for appellees.

Before CLARK, Circuit Judge, HILL * and COFFIN **, Senior Circuit Judges.

PER CURIAM:

On September 17, 1990, appellee Walker Chandler ("Chandler") filed suit in federal district court against the Georgia Public

---

\* *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

\*\* Honorable Frank M. Coffin, Senior U.S. Circuit Judge for the First Circuit, sitting by designation.

Telecommunications Commission ("GPTC"), an instrumentality of the State of Georgia. Chandler, the Libertarian candidate for lieutenant governor of Georgia, sought to enjoin GPTC from broadcasting a political debate on November 2, 1990, between the Democratic and Republican candidates for lieutenant governor unless he were included as a debating participant. Carole Ann Rand ("Rand"), the Libertarian candidate for governor, intervened as plaintiff and sought a similar injunction against the broadcast of a similar debate on November 4, 1990, between the Democratic and Republican candidates for governor.[1] After the plaintiffs had amended their complaint to add the members of GPTC in their individual and official capacities, the district court on October 18, 1990, issued a temporary restraining order. 749 F.Supp. 264. Basing its decision on First Amendment and Equal Protection grounds, the district court enjoined the defendants from televising either debate unless they included the Libertarian candidates. This expedited appeal followed.[2] Briefs were filed on a time-shortened schedule, and we heard oral argument in Atlanta on October 30. We VACATE the district court's order permanently and REMAND with instructions to dismiss the complaint.

In view of the fact that the parties are in need of a prompt resolution of the issues, we delay the issuance of our judgment only long enough for the following succinct opinion.

**1.** Chandler and Rand were offered thirty minutes of air time on the GPTC stations to present their views.

**2.** Subsequent to the district court's order, The Atlanta Journal and The Atlanta Constitution, the party responsible for paying the cost of the stage set-up for the gubernatorial debate (GPTC is responsible for broadcast and other costs), intervened to pursue an appeal. The newspaper has no active role in the lieutenant gubernatorial debate; GPTC itself decided to initiate and broadcast that debate.

**3.** In *Schneider*, we cited Judge Rubin's concurring opinion in *Muir v. Alabama Educ. Television Comm'n*, 688 F.2d 1033 (5th Cir.1982) (en banc), *cert. denied*, 460 U.S. 1023, 103 S.Ct. 1274, 75 L.Ed.2d 495 (1983), a former Fifth Circuit case that is binding precedent under

## I. FIRST AMENDMENT

This court has held that the degree of control that a public broadcast licensee can exercise over its broadcast programming consistent with the First Amendment depends on the mission of the communicative activity being controlled. *Schneider v. Indian River Community College Found., Inc.*, 875 F.2d 1537, 1541 (11th Cir.1989).[3] Where the activity does not function as a pure marketplace of ideas, the state is permitted to regulate content in order to prevent hampering the primary function of the activity. *Id.* (citing *Muir*, 688 F.2d at 1050). Were GPTC a medium open to all who have a message, whatever its nature, GPTC would function as a marketplace of ideas. *See Muir*, 688 F.2d at 1052 (Rubin, J., concurring). GPTC, however, is not such a medium. GPTC is "created, designed, and intended for the purpose of providing educational, instructional, and public broadcasting services to the citizens of the State of Georgia." O.C.G.A. § 20–13–5(a) (Supp.1990). Further, as a public television station, GPTC is under an obligation to serve the public interest. *Schneider*, 875 F.2d at 1541. As testimony indicated, GPTC's employees make editorial decisions on a daily basis determining which programs to air in order to meet the needs and interests of Georgia's citizens. Obviously a decision to broadcast one program excludes, for that time, all other programs.[4] Members of the

*Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir.1982). Judge Rubin's concurrence is the holding of *Muir* because, absent a majority opinion, the narrowest concurrence is the holding of the case. *Schneider*, 875 F.2d at 1541.

We note that appellees contend that *Schneider* and *Muir* should not control this case. We disagree. While the facts of those cases are not identical to the instant case, those cases addressed a very similar issue to the one before us: the extent of discretion a public broadcast licensee can exercise consistent with the First Amendment.

**4.** In a similar vein, it might be said that plaintiffs were *excluded* from the program. The decision to air a debate between the Democrat and Republican candidates may be said to exclude, by not including, all others, Libertarian, write-in or potentials.

public are not provided free access to GPTC air time.

■ It is clear that GPTC "regulated content" by making a decision to air debates between candidates of the major parties. Contrary to the district judge's order, however, this content-based decision is not viewpoint restrictive and does not violate the First Amendment. As noted above, GPTC makes content-based decisions on a regular basis in order to serve Georgians. A decision to air any show is necessarily content-based. GPTC chose to air a debate between only the Democratic and Republican candidates because it believed such a debate would be of the most interest and benefit to the citizens of Georgia. Such a decision promoted GPTC's function, was "reasonable" and was "not an effort to suppress expression merely because public officials oppose the speaker's views." *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 800, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985).

Finding no policy or practice of GPTC that "pervasively 'curtail[s] access to ideas,' lending a constitutionally impermissible, discriminatory bias to the station's mission," *Schneider*, 875 F.2d at 1541, we conclude that the district court erred in basing its order on First Amendment grounds.[5]

## II. EQUAL PROTECTION

■ The district court concluded that, for many of the same reasons that appellants' actions violated the First Amendment, a violation of the Equal Protection Clause of the Fourteenth Amendment also existed. Appellees are not members of a protected class, and thus appellants need only exhibit a rational basis for their decisions. *See Eide v. Sarasota County*, 908 F.2d 716, 722 (11th Cir.1990). As we determined above, appellants' decisions were rational, and we thus find no Equal Protection violation.[6]

## III. CONCLUSION

Our view does not mandate, authorize or predict Orwellian state thought control through selective airing of viewpoints on public television stations. Without deciding, we can safely predict that the use of state instrumentalities to suppress unwanted expressions in the marketplace of ideas would authorize judicial intervention to vindicate the First Amendment. Short of that, public television stations must, no matter what may be the wishes of state government personalities, abide by the dictates of 47 U.S.C. § 315 regarding fairness and balance or lose their licenses.

The dissent is facially appealing insofar as it deplores the failure of the appellants to invite just one more participant to each program. Whether that is good policy is, we believe, for the program decisions of the station. Were we to hold that such an invitation is required by the Constitution, we could see no principled basis upon which that rule could be limited to the candidate who has obtained a ballot position and not extended to all other serious candidates. A decision to air the debate between the two front runners, or the three who will appear on the ballot, or others, is appropriately made by the programmers undertaking to provide an educational program of sufficient interest to attract viewers. The mixture of ideas, protected by the First Amendment, is just as protected when offered by a write-in candidate as by one on the ballot by petition, by primary election, or by party convention. We are not willing to establish a precedent that would require public television stations to forego the broadcast of controversial views touching upon important public issues—environ-

---

5. We note that we are not alone in finding that the First Amendment does not necessarily grant political candidates the right to be included in candidate debates. *See, e.g., DeYoung v. Patten*, 898 F.2d 628, 632–33 (8th Cir.1990) (finding, among other things, that minor party candidate who had not been included in a debate conducted and televised by Iowa Public Television had "no First Amendment right to appear on television, at least to any extent greater than the limited right of access granted by the equal time provision of the Federal Communications Act"), and the cases cited therein.

6. We thus need not address the debate among the parties over Equal Protection cases from other circuits.

ment, ecology, animal rights, ozone depletion—lest the airing of such programs require the inclusion of a cacophony of differing views on each subject. The values sought to be fostered by the First Amendment would be frustrated, not furthered, by the fitting of such harnesses on public television.

We review the district court's grant of preliminary injunctive relief for abuse of discretion. *United States v. Jefferson County*, 720 F.2d 1511, 1519 (11th Cir.1983). For the foregoing reasons, we conclude that the district judge did abuse his discretion in finding a substantial likelihood of success on the merits. Because appellees do not meet the first part of the test for a preliminary injunction, we need not address the other elements of the test. *Id.*

We thus VACATE the district court's order permanently and REMAND with instructions to dismiss the complaint.

CLARK, Circuit Judge, dissenting:

This First Amendment case concerns the use of Georgia's publicly-owned television network to broadcast a public debate between two of the three candidates for the position of governor, and between two of the three candidates for the position of lieutenant-governor. I applaud the decision to use the network for the debates; I deplore the state's exclusion of the duly qualified candidates of the Libertarian Party. Under the facts of this case, the First Amendment forbids the state from selectively choosing which qualified candidates can and cannot debate and further forbids the state from denying its citizens the opportunity of simultaneously viewing the candidates whose names will face them on the ballot. The uncensored right to speak and to hear go to the heart of governance

in this democracy. Political debate should have the highest rank on the First Amendment's scale of liberties. Thus, I respectfully dissent.

## I. BACKGROUND

As noted by the majority, the Georgia Public Telecommunications Commission (GPTC) [1] is an agency of the state of Georgia established by statute. GPTC is composed of nine members, six of whom are members of the general public appointed by the governor. GPTC also includes one elected official, the state school superintendent, as well as the chancellor of the university system and the commissioner of technical and adult education. O.C.G.A. § 20–13–2 (Supp.1990).

Besides the Republican and Democratic candidates, appellees are the only other ballot-qualified candidates in the races for governor and lieutenant-governor. They have qualified to appear on the general election ballot under O.C.G.A. § 21–2–180 by being nominated by a party that in the last statewide election received votes equal to at least one percent of the number of registered voters in the state of Georgia. [2]

Appellees asked to be included in the two debates. GPTC refused to include them and offered the Libertarians one-half hour of television time each to state their views. Appellees then filed suit seeking an injunction against the sponsors of the debates. The district court concluded that a temporary restraining order should issue to prevent the broadcast of the debates from taking place without the participation of the Libertarian candidates. The district court held that "defendants have failed to even articulate a reasonable basis for excluding ballot-qualified Libertarian candidates from a nonpublic forum." Order of Oct. 18, 1990, at 8. The court rejected

---

**1.** Appellees' amended complaint names the directors and officers of GPTC as defendants in their individual and official capacities. These defendants are: Frank Bugg, deputy director; Dr. Richard Ottinger, executive director; Bill Johnston, director of production; Frank Jones, chairman, board of directors; and boardmembers William Allison, Dr. Kenneth Breeden, Nancy Connolly, Lovick Corn, Robert James,

Dr. Dean Probst, Dr. Werner Rogers, and Jackie Ward. *See* Plaintiffs' First Amendment of Complaint, Oct. 18, 1990, at 1.

**2.** In 1988, there were 2,941,339 registered voters in Georgia. Thus, a Libertarian candidate must have received at least 29,414 votes in a statewide election held that year.

appellants' argument that the Libertarians could be excluded on the basis that their views were less newsworthy than those of the major party candidates, holding that this was impermissible viewpoint-based discrimination. *Id.* at 10–11. The district court also found that appellees' Fourteenth Amendment equal protection rights had been violated. *Id.* at 13–14.

## II. DISCUSSION

The question involved here is essentially whether an arm of the state can organize and broadcast a debate between candidates for office, including some and excluding others. To my mind, the jurisprudence of the First Amendment surrounding the exclusion of speakers from government-created but nonpublic forums provides the answer.

The Supreme Court has established a typology of forums—state-created places of information-exchange—for purposes of First Amendment analysis. If a traditional forum (the public green, for example) is involved, the government must have a compelling state interest to justify any restrictions, which must be narrowly tailored. This rationale also applies to created forums, that is, government-designated places of communication "for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius v. NAACP Legal Defense & Educ. Fund,* 473 U.S. 788, 802, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567 (1985) (citation omitted). By contrast, where a nonpublic forum has been created—as in the case of teachers' school mailboxes, *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983) —the government may impose content-based restrictions that are both "reasonable" and "not an effort to suppress expression merely because public officials oppose the speaker's view." *Cornelius,* 473 U.S. at 800, 105 S.Ct. at 3448 (*quoting Perry Educ. Ass'n,* 460 U.S. at 46, 103 S.Ct. at 955).

In this case, candidates' ideas will be exchanged on the issue of state governance and will then be telecast to voters throughout Georgia. There is, however, no evidence here of governmental intent to "designate a place not traditionally open to assembly and debate as a public forum," *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449, as in no sense has the general public been invited to appear on GPTC's network and express its opinions on the election. It seems that, at a minimum, the government of Georgia has created a nonpublic forum.

However, by discriminating against the viewpoints expressed by the Libertarians, GPTC has violated even the minimal First Amendment standards applicable to nonpublic forums. *Cornelius* holds:

> Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral. Although a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum, or if he is not a member of the class of speakers for whose especial benefit the forum was created, the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject.

473 U.S. 806, 105 S.Ct. at 3451 (citations omitted).

The district court was correct to find that the exclusion of the Libertarians was not "reasonable in light of the purpose served by the forum." *Id.* The purpose of the debates is presumably to expose the voters of Georgia to the opinions and policies of the candidates for public office. Such a goal would be consistent with the educational goals of Georgia's public broadcasting network. Excluding certain qualified candidates is not a reasonable method of achieving the debates' informational goals. Moreover, the district court's finding that GPTC's decision to exclude the Libertarians was not "viewpoint neutral," *id.,* is amply supported by the record. The transcript of the evidentiary hearing held by the district court is replete with statements by Dr. Ottinger, the executive director of GPTC, that GPTC decided that the viewpoints of the Libertarians were

less valuable than those of the Democrats and Republicans: "The premise for the program that we designed was that the majority of the people would be most interested in the viewpoints of these two candidates, and that's why we want to put them head to head." Transcript, Oct. 18, 1990, at 20. "The point of views on the positions taken by the Democratic or Republican candidates would be of greater interest to the public than would be the Libertarian candidate in terms of the public making decisions who they would vote for." *Id.* at 22–23. "I think ... that the value of the program was that only these two sets of views would be expressed, one contrasted with the other, because, again, they are the frontrunners for which the majority of the people, in all likelihood, will vote." Question by the court: "You think the viewpoint expressed by the Libertarian candidates would somewhat detract from that?" A: "Yes, Sir." *Id.* at 33.[3]

Although it may be justifiable for private broadcasting networks to broadcast debates that exclude qualified candidates, *see, e.g., Johnson v. FCC*, 829 F.2d 157 (D.C. Cir.1987) (commercial networks may broadcast a debate between major party presidential candidates and exclude third parties' candidates, even those on the ballot in a number of states),[4] the purposes behind public broadcasting are significantly different from those behind commercial, competitive television. Public broadcasting is premised on the belief that the free market will not provide all of the programming and information necessary for an educated public. Thus, many programs that would fail miserably to pay their own way on the private networks appear on public television. The political debates at issue appear to be a case in point. In the context of noncompetitive programming, the government's stated rationale for excluding the Libertarians—that their views are less newsworthy than those of other candidates—seems especially weak and not a little ironic.

This case is akin to situations in which the government has acted to prevent expression simply because officials do not agree with the message conveyed. For example, in *Brooks v. Auburn Univ.*, 412 F.2d 1171 (5th Cir.1969), this court held that the First Amendment was violated when the president of Auburn University rescinded an invitation to the Reverend William Sloane Coffin to speak on campus. The opinion stated that "the right of the faculty and students to hear a speaker ... cannot be left to the discretion of the university president on a pick and choose basis." *Id.* at 1172; *see also Board of Educ. v. Pico*, 457 U.S. 853, 879, 102 S.Ct. 2799, 2814, 73 L.Ed.2d 435 (1982) (Blackmun, J., concurring) ("[O]ur precedents command the conclusion that the State may not act to deny access to an idea simply because state officials disapprove of that idea for partisan or political reasons." (footnote omitted)). There is little as important as an informed electorate. The electorate is the ultimate check on governmental abuse of power. To allow political appointees such as those that comprise the GPTC board to "pick and choose" the information the public receives from the interplay of candidates speaking unrehearsed short-circuits the controls built into our governmental system.

GPTC cannot persuasively maintain that, merely because candidates do not belong to one of the two major national parties, their electoral bids are never successful with the Georgia electorate. As recently as 1968, George C. Wallace carried Georgia in the presidential election, garnering 42.9% of the vote. *Statistical Abstract of the United States, 1976,* Table 729, at 455 n. 5 (Bureau of the Census, 1976). Would GPTC have excluded George Wallace from debates it had organized between Richard Nixon and Hubert Humphrey because it

---

**3.** Ottinger further testified that it would not be difficult to expand the format one-half hour to include the Libertarians. Transcript, Oct. 18, 1990, at 24.

**4.** I note that the FCC has refused to prohibit non-inclusive debates broadcast over the public airwaves, regardless of the sponsor. *See* In re *Cyril E. Sagan,* 1 FCC Rcd. 10 (1986). Although I believe much deference to agency decision-making is due, the courts are the ultimate guardians of the Constitution.

perceived that Wallace was unlikely to win the presidency, having a largely regional appeal? Unquestionably, nomination by a major party bestows a greater likelihood of election than nomination by a less well-known party. And the Libertarian candidates may very well be quite far behind in the polls.[5] But a judgment that their views are not newsworthy, especially given the station's willingness to provide one-half hour each to the Libertarian candidates apart from the debates, indicates that GPTC's decision to exclude them "is in reality a facade for viewpoint-based discrimination." *Cornelius*, 473 U.S. at 811, 105 S.Ct. at 3453–54; *see also Searcey v. Harris*, 888 F.2d 1314, 1324–25 (11th Cir. 1989) (exclusion of anti-military activists from school career days constitutes viewpoint-based discrimination).

The majority finds that a line of cases following Judge Rubin's concurrence in the former fifth circuit case of *Muir v. Alabama Educ. Television Comm'n*, 688 F.2d 1033 (5th Cir.1982) (en banc), is controlling and requires that courts give maximum leeway to programming decisions of public broadcasters. Judge Rubin "held that the degree of control which can be exercised consistently with the First Amendment depends on the mission of the communicative activity being controlled. Where ... the activity is not designed to function as a pure marketplace of ideas, 'the state may regulate content in order to prevent hampering the primary function of the activity.'" *Schneider v. Indian River Community College Found.*, 875 F.2d 1537, 1541 (11th Cir.1989) (*quoting Muir*, 688 F.2d at 1050 (Rubin, J., concurring)). *Muir* thus stands for the proposition that public TV may decide not to broadcast a program based on its *content.*

In contrast to the situation in *Muir*, this case concerns the First Amendment rights of the Libertarians to express their viewpoints, not the prerogative of the Georgia Public Television Network to maintain control over programming content. GPTC has already determined, to the extent it can, the content of its broadcasts of the two

debates. That is to say, GPTC has already decided to give over its airwaves to political contenders for the offices of governor and lieutenant-governor of Georgia. GPTC has not and could not dictate the actual messages those contenders will convey. Appellees do not challenge GPTC's content-based decision to air debates between political candidates. Instead, they challenge GPTC's decision to exclude their particular viewpoints from the electoral conversation.

The majority quotes *Schneider*, 875 F.2d at 1541, for the proposition that the Libertarians must show that GPTC has followed a policy or practice of "pervasively 'curtailing access to ideas.'" *Id.* (*quoting Muir*, 688 F.2d at 1053). However, Dr. Ottinger admitted that the audience for the Libertarians' separate half-hour would be significantly diminished from the audience for the debate. Transcript, Oct. 18, 1990, at 20. By not allowing either of the Libertarians to present their opinions with the other ballot-qualified candidates, the state of Georgia is clearly limiting the number of people who will be exposed to the Libertarians' views. Perhaps more importantly, the decision to show or not to show a particular program or documentary and the ideas contained therein is very unlike the decision to exclude political parties from a debate. The positions put forward in a particular television program may find equally effective expression through a wide variety of media. I would not contend, therefore, that when the state shows a documentary it must include all viewpoints in that documentary. But an idea is not a candidate, and freedom of speech has a greater meaning in the election arena. There is only one way for candidates themselves to argue their positions with each other: through the medium of a debate. A debate serves to inform the public far more effectively than any candidate's lone appearance could, by creating a synergism between the candidates' immediately conflicting positions. For the state to set up such a debate and exclude certain candidates not only puts its stamp of approval on the favored candidates, it also "curtail[s] ac-

---

**5.** However, Dr. Ottinger admitted that the decision to exclude the Libertarians was not based on an examination of opinion polls. Transcript, Oct. 18, 1990, at 30.

cess to ideas" by preventing the ideas and information that would be produced through the debating candidates' interaction from coming to light.

The district court's decision to draw a distinction between ballot-qualified and write-in candidates for purposes of access to the debate was justified. The state of Georgia has established an objectively neutral method of qualifying for the ballot—in this case, the Libertarians won at least 29,414 votes in the last statewide election. Write-in candidates do not have to meet the same test of public support. Given a limited amount of broadcasting time, it would seem reasonable to distinguish between these two groups of candidates. GPTC could have thereby avoided any inquiry into the viewpoints or newsworthiness of the candidates involved; it could have thereby avoided having an agency of the state effectively endorse the major party candidates. The majority argues that the First Amendment makes no distinction between the ideas of candidates, whether write-in or major party. I agree and would add that neither should the officers of GPTC. But where lines must be drawn, the opinion of at least 29,000 voting Georgians seems a perfectly valid distinction to make. I cannot say the same for the unbridled discretion of GPTC.

This court should, in this case and all others, decide the question before it. We are not faced with a situation where there are forty-four ballot-qualified candidates running for the governor of Georgia, or even four. It is clear that, were it difficult or impossible to conduct a debate with the number of candidates qualified for the ballot, GPTC would have a neutral and not viewpoint-based rationale for not having all of the candidates on the same debate panel at the same time. But there has been no showing that this is the case here, and there is time enough to decide questions that have not presented themselves.

The restraining order entered as to both debates, including the debate sponsored by the Atlantic Journal–Constitution should be upheld because the state of Georgia is effectively endorsing the major party candidates by broadcasting a debate that excludes other candidates. The state must actively avoid even the appearance of favoritism between candidates. If nonbroadcast entities such as the Atlantic Journal–Constitution know that the only broadcast outlets typically available for political debates (i.e., public television) are prohibited from televising debates that do not include all qualified candidates willing and able to appear, they will factor this knowledge into their estimates of the planning and lead time necessary to organize debates.

### III. CONCLUSION

The Libertarian candidates wish to address topics that are within the parameters of the debates. They are members of the class of speakers for whom the debates were created, having qualified to appear on the general election ballot. And a decision that excludes the Libertarians based on the fact that their views are less newsworthy than those of the major party candidates is necessarily based on an estimation of the value and substance of their views. Because viewpoint discrimination is unconstitutional in any forum, public or otherwise, the district court should have been affirmed.