**Marilyn ARONS, Plaintiff,**

v.

**Kathleen A. DONOVAN, County Clerk of Bergen County, et al., Defendants.**

**Civ. A. No. 93–4468(JCL).**

United States District Court, D. New Jersey.

March 29, 1995.

---

Marilyn Arons, Teaneck, NJ, pro se.

Alan C. Stephens, Deputy Atty. Gen. of N.J., Trenton, NJ, Florence J. Lotrowski, County of Middlesex, Office of County Counsel, New Brunswick, NJ, Howard F. Appelt, Morris County Admin. and Records, Morristown, NJ, for defendants.

## OPINION

LIFLAND, District Judge.

Presently before the Court are defendants' motions to dismiss the Complaint for mootness, for failure to state a cause of action pursuant to *Fed.R.Civ.P.* 12(b)(6), and for summary judgment pursuant to *Fed.R.Civ.P.* 56. Plaintiff, appearing *pro se*, has cross-moved for summary judgment. For the reasons set forth below, the Court will: deny defendants' motion to dismiss the Complaint as moot; grant in part and deny in part defendants' motion to dismiss the Complaint for failure to state a cause of action; decline to exercise supplemental jurisdiction over plaintiff's state law claims; grant defendants' motion for summary judgment as to plaintiff's constitutional claims; and deny plaintiff's cross-motion for summary judgment.

## BACKGROUND

Plaintiff, an activist and advocate for special education-related issues, was an unsuccessful independent candidate for Governor of New Jersey in 1993. Defendant New Jersey Public Broadcasting Authority ("Au-

thority") is a state agency.[1] On October 12, 1993, plaintiff brought an action against Bergen County Clerk Kathleen Donovan and the New Jersey Election Law Enforcement Commission ("ELEC"). Her initial Complaint alleged that she was harmed by the failure of the New Jersey County Clerks to send "gubernatorial statements" to absentee voters. Her Complaint further alleged that she suffered discrimination due to her limited access to the media, and an allegedly inequitable allocation of state gubernatorial campaign funds. Plaintiff specifically sought to have the Court enjoin the gubernatorial election for one month; direct ELEC to declare her a "qualified" candidate [2] and release $20,000 to her campaign; and direct the scheduling of two televised debates involving independent candidates as well as the Democratic and Republican candidates.

By Order filed on October 21, 1993, the Court denied all relief, and gave plaintiff leave to amend her Complaint.

Plaintiff filed an Amended Complaint naming as defendants the Authority, the State of New Jersey and the remaining New Jersey County Clerks. The Amended Complaint sought to have the Court compel the Authority to

> promote actual discussion of the issues by plaintiff, as well as any other interested independent candidate, or in the alternative, a dollar award as a result of the damages to plaintiff as a result of defendants' failure to promote full discussion of the issues.

*Amended Complaint,* p. 1.

Plaintiff also sought to have the Authority "maintain balance, fairness and equity in her campaign"; to have the Court issue an Order requiring ELEC to schedule "interactive" debates in which plaintiff could participate; and to have the Court issue an Order delaying the election on the grounds that a number of absentee voters did not receive her 500-word "gubernatorial statement". *Amended Complaint.*

Plaintiff contends that she was the victim of a "news blackout." She claims that after she filed as an independent candidate for Governor in April 1993, she sent press releases and news letters to various media outlets, including the Authority. Plaintiff claims that despite these mailings, and despite what she characterizes as a high-profile career as a public advocate, she received inadequate coverage from the Authority.

On November 1, 1993 plaintiff again moved for a preliminary injunction to postpone the election due to the failure of the County Clerks to mail her 500-word "gubernatorial statement" along with absentee ballots. Judge Debevoise denied the application.

In February and March 1994, plaintiff withdrew all claims against the County Clerks and ELEC. The portions of the Complaint that apply to the Authority concern the breadth and fairness of the Authority's overall campaign coverage, and the Authority's alleged failure to cover plaintiff's campaign. The Complaint seems to allege that the Authority's failure to adequately cover plaintiff's campaign violated N.J.S.A. 19:44A–39 (Section 14 of the 1974 "Act to amend and supplement 'The New Jersey Campaign Contributions and Expenditure Reporting Act' "), N.J.S.A. 48:23–7(h) (Section 7 of the "New Jersey Public Broadcasting Authority Act"), 47 U.S.C. § 315 and the First and Fourteenth Amendments to the United States Constitution. Additionally, the Complaint seems to allege that the Authority was legally obligated to cover plaintiff's campaign in a fair, balanced and nonpartisan manner; that by offering plaintiff an

---

1. The Authority is an instrumentality of the state of New Jersey. It was established in 1968 by the New Jersey Public Broadcasting Authority Act, N.J.S.A. 48:23–1 et seq. The Authority owns and operates stations licensed by the Federal Communications Commission (FCC), which constitute the New Jersey public television network. *McGlynn v. New Jersey Public Broadcasting Authority,* 88 N.J. 112, 439 A.2d 54 (1981).

2. N.J.S.A. 19:44A–45 provides that there are to be a series of interactive debates open to "qualified candidates ... for election to that office who have applied for or intend to apply to receive money for election campaign expenses under ... N.J.S.A. 19:44A–33." The statute defines "qualified candidates" as those who have raised and expended $150,000 and who will be applying for campaign matching funds; only these candidates will be permitted to participate in the gubernatorial debates.

insufficient amount of media exposure, the Authority violated her First Amendment rights; and that since the Authority is a state agency, its actions are attributable to the state and subject to the Fourteenth Amendment's equal protection guarantees.

In her Amended Complaint, plaintiff seeks the following relief: an order compelling the Authority "to promote actual discussion of the issues by plaintiff as well as by any other interested candidate"; an order compelling the Authority to "maintain balance fairness and equity" in its coverage of plaintiff's campaign; an order designating plaintiff a "qualified candidate"; an order enabling plaintiff to participate in at least one interactive gubernatorial debate; and an end to the what plaintiff characterizes as a state-imposed "news blackout" directed against plaintiff's candidacy.

## DISCUSSION

### 1. Mootness

■ Defendants move to dismiss the Complaint on the ground of mootness. Defendants argue that because plaintiff seeks injunctive relief regarding an election that has passed, her claims are now merely "abstract questions" which the Court should not decide. Defendants note the Supreme Court's holding that "federal courts are without power to decide questions that cannot affect the rights of litigants in the case before them." *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971).

The Court disagrees with defendants' contention. The issues in the instant case are not moot merely because the election that gave rise to the request for injunctive relief is over. In *Johnson v. Federal Communications Commission,* 829 F.2d 157 (D.C.Cir. 1987), minority presidential and vice-presidential candidates brought an action seeking an order that would prohibit the televising of a debate from which they were excluded. In July, 1984, plaintiffs had written a series of letters to the League of Women Voters, the three major private networks, and the Public Broadcasting System, requesting inclusion in the League of Women Voters' presidential and vice-presidential debates scheduled for that fall. In August, 1984, plaintiffs filed a complaint against the networks, the Demo-

cratic and Republican National Committees, the major party candidates, and the League, alleging upcoming violations of the Communications Act, 47 U.S.C. §§ 151–611 (1982), and the First Amendment. After the Commission denied the Complaint, plaintiffs petitioned the District Court for review.

The district court held that even though the election was over, the case was not moot.

> The issues properly presented, and their effects on minor party candidacies, will persist in future elections, and within a time frame too short to allow resolution through litigation. This is, therefore, a case where the controversy is 'capable of repetition, yet evading review,' .... and as such may be decided now.

*Id.* at 159 n. 7 (Citations omitted).

In *Moore v. Ogilvie,* 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969), the Supreme Court addressed the constitutionality of an Illinois statute requiring that a petition to nominate candidates for general election for a new party be signed by a certain number of qualified voters. In holding that the statute violated the due process and equal protection clauses of the Fourteenth Amendment, the Supreme Court rejected defendants' claim that the issue was moot.

> [W]hile the 1968 election is over, the burden ... allowed to be placed on the nomination of candidates for statewide office remains and controls future elections ... [t]he problem is therefore 'capable of repetition yet evading review.' (citation omitted) The need for its resolution thus reflects a continuing controversy.

*Id.* at 816, 89 S.Ct. at 1494.

The issue of public television's coverage of gubernatorial campaigns is likely to re-emerge in future electoral seasons. Since this issue reflects a continuing controversy, defendants' motion to dismiss the Complaint as moot is denied.

### 2. Failure to State a Claim

Defendants argue that they are entitled to "summary judgment" due to plaintiff's failure to state a claim upon which relief can be granted. Defendants misstate the relief they

seek; they are here asking for relief pursuant to *Fed.R.Civ.P.* 12(b)(6), not summary judgment, and the Court will treat this portion of their argument as a 12(b)(6) motion.

■ A complaint should not be dismissed for failure to state a claim unless plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Where, as here, the action derives from a *pro se* civil rights complaint, a court must not dismiss the action unless it appears beyond a clear doubt that plaintiff can prove no set of facts which would entitle him or her to relief. *Zynn v. O'Donnell,* 688 F.2d 940 (3d Cir.1982).

■ The allegations of a *pro se* complaint are held to less stringent standards than formal pleadings drafted by lawyers. *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), *reh'g den.* 405 U.S. 948, 92 S.Ct. 963, 30 L.Ed.2d 819 (1972).

Defendants offer very little in support of their argument that plaintiff fails to state a claim; their limited efforts on their own behalf are of little assistance to the Court. Defendants broadly argue that plaintiff has failed to show that the Authority violated her rights and has failed to allege intentional discrimination against her, or against her campaign. Defendants cite *Gamza v. Aguirre,* 619 F.2d 449, 453 (5th Cir.1980). However, the facts of *Gamza* are significantly different from those of the instant case. In *Gamza,* a candidate for the school board of an independent school district in Texas brought a civil rights suit alleging that elec-tion votes were improperly counted and that as a result, the candidate's opponent was improperly declared to be the winner. The Court distinguished between state laws and state actions that systematically deny equality in voting, and "episodic events that may result in the dilution of an individual's vote." Defendants in the case at bar point to *Gamza*'s holding that the unlawful administration by state officials of a nondiscriminatory state law does not amount to a denial of equal protection without an element of purposeful discrimination. *Id.* at 453. While plaintiff in the instant case does allege a violation of her Fourteenth Amendment rights, her claims address the right to vote indirectly at best. Her constitutional claims go to her alleged right to be seen and heard on public television, and the discretionary power of a state actor to limit her exposure.

For reasons that follow, the Court will partially grant and partially deny defendants' motion to dismiss on 12(b)(6) grounds.

### 2a. Plaintiff's Federal Statutory Claims

■ The Federal Communications Act, 47 U.S.C. § 315, imposes on broadcasters an obligation to operate in the "public interest" and to permit the discussion of conflicting views on issues of public importance.[3] The parties do not contest that plaintiff was afforded an opportunity to read her 500–word gubernatorial statement on the air, and that this reading was broadcast towards the end of the campaign. *Amended Complaint, Allegations,* ¶ 1; *Amended Complaint,* Exhibit A; *Plaintiff's Cross Motion For Summary*

---

3. 47 U.S.C. § 315 states in pertinent part:

If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station: *Provided,* That such licensee shall have no power of censorship over the material broadcast under the provisions of this section. No obligation is imposed under this subsection upon any licensee to allow the use of its station by any such candidate. Appearance by a legally qualified candidate on any—
(1) bona fide newscast
(2) bona fide news interview
(3) bona fide news documentary (if the appearance of the candidate is incidental to the pre-sentation of the subject or candidates covered by the news documentary), or
(4) on-the-spot coverage of bona fide news events (including but not limited to political conventions and activities incidental thereto) shall not be deemed to be use of a broadcasting station within the meaning of this subsection. Nothing in the foregoing sentence shall be construed as relieving broadcasters, in connection with the presentation of newscasts, news interviews, news documentaries, and on-the-spot coverage of news events, from the obligation imposed upon them under this chapter to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance.

*Judgment,* Exhibit L, Exhibit P ¶ 3. Yet plaintiff argues that this limited exposure does not amount to the statutorily mandated "discussion of conflicting views" and therefore does not "operate in the public interest."

With regard to plaintiff's federal statutory claims, the Court will grant defendants' motion to dismiss for failure to state a claim. There is no private cause of action under 47 U.S.C. § 315, and plaintiff's proper course of action is to bring her claim before the Federal Communications Commission (FCC). She may then appeal to a court of competent jurisdiction, if necessary. *Forbes v. Arkansas Educational Television Communication Network Foundation,* 22 F.3d 1423 (8th Cir. 1994); *Lechtner v. Brownyard,* 679 F.2d 322 (3d Cir.1982).

### 2b. Plaintiff's State Law Claims

Plaintiff alleges that the Authority's coverage of her campaign violated The New Jersey Campaign Contributions and Expenditures Reporting Act, as codified in N.J.S.A. 19:44A–39, and The New Jersey Public Broadcasting Authority Act, as codified in N.J.S.A. 48:23–7(h).

N.J.S.A. 19:44A–39 states as follows:

The New Jersey Public Broadcasting Authority ... shall promote full discussions of public issues by the candidates for nomination for election or election to the office of Governor on the ballot in any primary or general election, in accordance with Federal law and free of charge to the candidate. The Authority may promulgate such rules and regulations as may be necessary to effectuate the purpose of this section.

N.J.S.A. 48:23–7(h) empowers the Authority to:

(a)ssume responsibility for the character, diversity, quality, and excellence of programming which is released via licensed facilities, provided that the program or series of programs of a controversial nature shall be presented with balance, fairness and equity.

These statutes are designed to prevent the Authority from becoming an advocate for any political position or candidate. They encompass a duty to cover the elections in a balanced fashion. *McGlynn,* 88 N.J. at 127–128, 439 A.2d 54.

Plaintiff cites *McGlynn* to support her claim that the Authority failed to meet its obligation to cover the gubernatorial candidates with balance, fairness and nonpartisanship. Defendants cite *McGlynn* to point out that there is no right of "equal time" for candidates: rather, the Authority is merely required to promote full and fair discussion of the election itself, and may, to a large degree, use its discretion regarding the degree of coverage to be given to particular candidates. In *McGlynn* gubernatorial candidates challenged the Authority's refusal to include them in a televised forum to be broadcast during the final week of the primary campaign. The New Jersey Supreme Court held that the Authority did not violate its duty to maintain balance, fairness and equity in its campaign coverage by excluding plaintiffs. Rather, the Authority was held to have met its statutory obligations because its overall campaign coverage was fair and balanced.

The Court in *McGlynn* took pains to point out that N.J.S.A. 19:44A–39 does not require that any candidate be given equal time. Therefore, defendants are correct in stating that plaintiff has no right to be included in any particular program or series of programs, including a televised interactive debate. *See Amended Complaint,* p. 5. The Court in *McGlynn* read the absence of an equal time rule as a "general admonition" that the Authority's election coverage over the course of the campaign must not, on the whole, be unfair to any candidate. This standard gives the Authority broad discretion in deciding what is fair coverage. *Id.* at 146–147, 439 A.2d 54.

However, the Court in *McGlynn* held that

[I]t is difficult to see how the legislative mandate of full discussions among the candidates can be accomplished if some of the candidates are continually excluded from the discussions, or if the opportunity to appear provided to the candidates is grossly inequitable. We believe that the Legislature did not intend such a result.

█ Therefore, the Court held that the statute is to be read "inclusively." The statute does not give the Authority license to continually exclude candidates who have fulfilled the legal requirements for getting listed on the ballot. It would similarly not allow unfair or unbalanced coverage of those candidates. *Id.* at 130, 439 A.2d 54. The Court also held that the Authority's programming decisions are to be guided by notions of "basic fairness." Furthermore,

> the Authority is to have substantial discretion to determine what is fair in light of its journalistic judgment ... A candidate wishing to challenge the Authority's coverage of a gubernatorial campaign will be required to prove that the Authority's coverage, examined over the entire course of the campaign, has been or threatens to be unreasonably balanced.

*Id.* at 146–47, 439 A.2d 54.

The Court in *McGlynn* found that the exclusion of plaintiffs from an important election program violated the fairness requirement. Therefore, the Court affirmed an Appellate Division order that all candidates on the ballot for the Republican gubernatorial nomination be included in the televised forum. However, the Court found that the Authority's overall coverage was fair, even without including plaintiffs in the televised forum. The Court held that the decision to exclude plaintiffs was a "reasonable exercise of the broad discretion vested in the Authority to make editorial judgements in accordance with Federal and State law." *Id.* at 147–48, 439 A.2d 54.

█ The Amended Complaint alleges that defendants have violated plaintiff's right to fair and balanced coverage over the course of the campaign.[4] The pleadings afford the Court little basis to pass judgment on the fairness of the Authority's overall election coverage. Plaintiff supports her argument with reference to various press releases and newspaper clippings. These exhibits attest to her past efforts as a public advocate, the notoriety she has received as a result of these efforts, and her attempts to draw media attention to her campaign. *Plaintiff's Cross–Motion For Summary Judgment*, Exhibits B–L. Plaintiff also cites a book by Michael Aron, a political reporter for the Authority's New Jersey Network ("NJN"). The book is organized as a journal and chronicle of the 1993 gubernatorial campaign. Plaintiff argues that the book's near-exclusive focus on the major party candidates indicates imbalanced and unfair campaign coverage. *See generally, Plaintiff's Cross–Motion For Summary Judgment*, Exhibit O: Michael Aron, *Governor's Race: A TV Reporter's Chronicle of the 1993 Florio/Whitman Campaign* (Rutgers University Press 1994).

The pleadings suggest that plaintiff is a person of some renown in New Jersey, and that she has involved herself in issues that are of some public import. The Court is willing to acknowledge plaintiff's status as a semi-public figure, without reaching the issue of whether plaintiff was entitled to any more media coverage than she received during the campaign. The Complaint as it stands states a claim that plaintiff's rights under N.J.S.A. 19:44A–39 and 48:23–7(h) have been violated. However, the Court will decline to exercise supplemental jurisdiction over these state law claims.

█ The Court has no independent jurisdictional basis to hear a claim for violation of state statutes brought by a citizen of the State of New Jersey against the State or its agencies. Under 28 U.S.C.A. § 1367(c), the Court may decline to exercise supplemental

---

4. The *Allegations* section of the *Amended Complaint* states as follows:

1. The New Jersey Public Broadcasting Authority has not promoted full discussion of public issues in the 1993 gubernatorial election by excluding plaintiff from presenting any more than the reading of her 500 word gubernatorial statement. (Attachment A).

2. The New Jersey Public Broadcasting Authority has discriminated against the plaintiff by not permittin [sic] her to participate in full discussions of public issues.

3. The New Jersey Public Broadcasting Authority, NJN has not maintained balance, fairness and equity in its coverage of plaintiff's gubernatorial candidacy.

4. The New Jersey Public Broadcasting Authority has taken a political position by failing to broadcast controversial programs involving the plaintiff.

387

jurisdiction over a claim that raises novel or complex issues of state law. *McGlynn* did not clearly interpret the statutes at issue in this case. Therefore, the Court finds that the question currently before it—whether the Authority fairly covered plaintiff's campaign—is a novel issue of state law, and one which is better adjudicated in a state court.

U.S.C.A. § 1367(d) provides that the period of limitations for a dismissed claim is tolled for a period of 30 days after dismissal. Plaintiff is reminded that she has 30 days in which to file her state law claims in state court.

### 2c. Plaintiff's First and Fourteenth Amendment Claims

Plaintiff states that her rights under the First and Fourteenth Amendments were violated by the Authority's failure to cover her campaign. Defendants argue that plaintiff fails to state a claim for a violation of her Constitutional rights.

■ Generally speaking, a political candidate does not have a constitutional right to demand air time. *Forbes,* at 1428; *Kennedy For President Committee v. FCC,* 636 F.2d 417, 431 (D.C.Cir.1980). The Supreme Court has noted that

> broadcast media pose unique and special problems not present in the traditional free speech case. Unlike other media, broadcasting is subject to an inherent physical limitation. Broadcast frequencies are a scarce recourse; they must be portioned out among applicants. All who possess the financial resources and the desire to communicate by television or radio cannot be satisfactorily accommodated.

*Id.,* quoting *CBS v. Democratic National Committee,* 412 U.S. 94, 101, 93 S.Ct. 2080, 2086, 36 L.Ed.2d 772 (1973).

■ The Authority is not a privately owned broadcast licensee, but a state-run agency. Therefore, "actions taken by the station, as well as actions taken by its employees and representatives, are fairly attributable to the State and subject to the Fourteenth Amendment, unlike actions of privately owned broadcast licensees." *Forbes* at 1428. The question before the Court is

whether plaintiff had a right of access to the airwaves and whether the Authority had a right to exclude her that would survive First Amendment scrutiny. As outlined below, the Court holds that plaintiff did have a qualified right of access to the airwaves created by government sponsorship of the Authority's programming. Further, the Court agrees with the holding in *Forbes* which supports a right to appear on public television beyond that which is granted by 47 U.S.C. § 315. *Forbes* held that a decision to the contrary

> ... would allow a state-owned station to exclude all candidates with a certain point of view, except to the extent, if any, that the excluded candidates could obtain relief under the Communications Act. We believe the error of such a proposition is self-evident. The state may not, by statute or otherwise, take such a discriminatory action, absent a compelling state interest.

*Forbes* at 1428–29.

■ The Supreme Court has divided government property into three categories for the purposes of First Amendment analysis. First there is the public forum, which has traditionally been devoted to assembly and debate. Public television is not considered a public forum because it does not extend a general invitation to the public to appear on the airwaves. *See Muir v. Alabama Educational Television Commission,* 656 F.2d 1012, 1022 (5th Cir.1981). Therefore, there is no unlimited right to the airwaves. *Forbes,* citing *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

■ Second, there is the limited public forum, a venue which the government has opened for use for free speech for only a limited period of time, a limited topic, or a limited class of speakers. When the government acquiesces in the use of a public forum for expressive purposes, it may create a limited public forum. Therefore, by airing an interactive debate, the Authority may have created such a forum. *Forbes* at 1429, citing *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984). By this standard,

plaintiff has a First Amendment right to participate in the debate and may only be excluded if the Authority has a sufficient governmental interest in limiting participation.

In considering whether plaintiff's First Amendment rights have been violated, the Court must also consider whether plaintiff was a member of a class of speakers for whose benefit the televised debate was held. Plaintiff was arguably a member of a cognizable class (gubernatorial candidates) who wanted to address a topic relevant to campaign coverage (who should be elected Governor of New Jersey). By this standard, if the Authority has excluded plaintiff because of objections to her viewpoint, then it has violated her First Amendment rights. *Forbes* at 1429.

The third category of government property is the nonpublic forum, which consists of property usually incompatible with expressive activity. Where the principal function of such property would be disrupted by expressive activity, the Supreme Court has generally held that the government intended to create a nonpublic forum. *Cornelius v. NAACP Legal Defense and Educational Fund*, 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) (charity drive aimed at federal employees was a nonpublic forum where government created the drive to minimize the disturbance of federal employees while on duty). Military reservations, *Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) and jailhouse grounds, *Adderley v. Florida*, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) have been held to constitute non-public fora. In *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) the Supreme Court held that a school district's internal mail system was not a public forum, as it was not school board policy to grant general public access.

■ Even in the context of a nonpublic forum, certain First Amendment requirements apply. If the prospective speaker was a member of the class of persons for whose benefit the nonpublic forum was created, the government violates the First Amendment when it denies access to the speaker solely to suppress his or her point of view. *Forbes* at 1429, citing *Cornelius v. NAACP Legal Defense and Education Fund, Id.*

■ While the Authority is not a traditional public forum, it is clearly not incompatible with expressive activity. Therefore, the Court will treat the Authority as a limited public forum. In the context of either a limited public or nonpublic forum, plaintiff must allege a viewpoint based exclusion from the airwaves. Plaintiff has clearly done so, and has thereby stated a claim upon which relief can be granted. The Court will deny defendants' motion to dismiss plaintiff's federal constitutional claims on 12(b)(6) grounds.

■ The question before the Court is complicated by the fact that plaintiff was not "qualified" to appear in the debate under New Jersey law. As stated above, N.J.S.A. § 19:44A–45 provides that "qualified" candidates (those who have raised and expended $150,000 and who apply for matching funds) may appear in interactive debates. Plaintiff claims that the financial qualification is discriminatory, and seeks to have the Court declare her a "qualified candidate." However, the Complaint seems to allege this measure of discrimination against ELEC, and the case against ELEC was voluntarily dismissed on March 1, 1994. This claim may be alleged against the State of New Jersey, but only on proper notice.

The Court is mindful of the lenient pleading standards to which *pro se* plaintiffs are entitled. However, the question of the constitutionality of N.J.S.A. § 19:44A–45 has not been adequately addressed by either side in this case. Plaintiff fails to make particularized arguments that the statute is unconstitutional, and fails to provide the State of New Jersey with sufficiently clear notice of such a claim. Therefore, plaintiff's claim regarding the constitutionality of N.J.S.A. § 19:44A–45 is dismissed without prejudice. If she chooses, plaintiff may file a new Complaint presenting this issue squarely against the State of New Jersey.

As set forth above, the Court declines to exercise supplemental jurisdiction over plaintiff's state law claims, which she may file in state court within 30 days. In her state

court pleadings, plaintiff is free to allege the federal law claim that N.J.S.A. § 19:44A–45 violates the United States Constitution, as well as the claim that it violates the New Jersey Constitution.

### 3. Summary Judgment

### 3a. Defendants' Motion For Summary Judgment

Defendants move for summary judgment on the ground that, as a matter of law, the Authority has a right to regulate its broadcast content while plaintiff has no First Amendment right to appear in any debate.

Summary judgment is appropriate when there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P.* 56. The burden of showing that no genuine issue of material fact exists rests initially on the moving party. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). "This burden ... may be discharged by 'showing' ... that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). All evidence submitted must be viewed in a light most favorable to the nonmoving party. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Once a properly supported motion for summary judgment has been made, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). No issue for trial exists unless the nonmoving party can demonstrate

sufficient evidence favoring the nonmoving party such that a reasonable jury could return a verdict in that party's favor. *Id.* at 249, 106 S.Ct. at 2510.

Defendants' motion for summary judgment relies heavily on *Chandler v. Georgia Public Telecommunications Commission*, 917 F.2d 486 (11th Cir.1990) and *DeYoung v. Patten*, 898 F.2d 628 (8th Cir.1990). The Court notes at the outset of this discussion that the portion of *DeYoung* on which defendants rely has been overruled by another 8th Circuit case, *Forbes*, at 1430.[5]

In *Chandler*, Libertarian Party candidates for Governor and Lieutenant Governor of Georgia sought to enjoin debates to be broadcast on a public television station because the debates included only the major party candidates. Plaintiffs argued that their exclusion from the debates violated the First and Fourteenth Amendments of the U.S. Constitution. In rejecting plaintiff's arguments, the Eleventh Circuit Court of Appeals held that:

GPTC [the public television station] makes content-based decisions on a regular basis in order to serve Georgians. A decision to air any show is necessarily content-based. GPTC chose to air a debate between only the Democratic and the Republican candidates because it believed that such a debate would be of the most interest and benefit to the citizens of Georgia. Such a decision promoted GPTC's function, was "reasonable" and was "not an effort to suppress expression merely because public officials opposed the speakers views."

Finding no policy or practice of GPTC that "pervasively 'curtail[s]' access to ideas" lending a constitutionally impermissible, discriminatory basis to the station's mission," we conclude that the district court erred in basing its order [enjoining broad-

---

5. *DeYoung* held that a political candidate, suing a public television station for refusing to include him in a televised debate, had no First Amendment right to appear in such a debate; rather, the television station had a right to regulate its content. This holding might have been persuasive had *DeYoung* not been overruled by *Forbes*. (*Forbes* was decided on April 28, 1994. The record indicates that defendants' summary judg-

ment motion was filed on June 30, 1994). *Forbes* states as follows:

That portion of *DeYoung v. Patten* which holds that the First Amendment places no restraint, beyond that imposed by the Communications Act, on the right of state agencies to sponsor candidate debates and pick and choose which candidates may take part, is overruled. *Forbes* at 1430.

cast of the political debates] on First Amendment grounds.

*Chandler* at 489 (citations omitted).

The facts of *Chandler* are similar to those of the case at bar. The public television station in *Chandler* offered plaintiffs 30 minutes of air time to respond to the debates from which they were excluded. *Chandler* at 488, n. 1. This grant of rebuttal time is roughly analogous to the opportunity to read a 500-word campaign statement offered by the Authority; if anything, the Georgia station's offer permitted the excluded candidates a greater degree of access.

Nevertheless, the Court notes that in *Forbes,* Chief Judge Arnold addressed *Chandler* and disagreed with its central conclusion: that the television station's content-based decision to exclude the Libertarian Party candidates was not viewpoint restrictive and did not violate plaintiffs' First Amendment rights. Chief Judge Arnold cited with approval the dissenting opinion in *Chandler*. *Forbes* at 1430, n. 4. In the *Chandler* dissent, Judge Clark found that GPTC's determination that the Libertarian viewpoint was not newsworthy was actually a facade for viewpoint based discrimination. *Chandler* at 492. Such discrimination would put an official stamp of approval on certain candidates, and would prevent the emergence of new ideas through the interaction of debating candidates. *Id.* at 493. Therefore, Judge Clark found that GPTC's actions violated "even the minimal First Amendment standards applicable to nonpublic forums." *Id.* at 491.

■ This Court agrees with Chief Judge Arnold's and Judge Clark's rejection of the majority opinion in *Chandler*. By the standard articulated in *Forbes,* the Authority may not make a content-based decision to exclude plaintiff. Any such decision would be viewpoint-restrictive and violative of plaintiff's First Amendment rights.

■ Plaintiff alleges that the Authority may not deny her right of access to the airwaves absent a viewpoint-neutral justification. This claim poses an obvious factual question: did the Authority limit plaintiff's

right of access to the airwaves because of objections to her viewpoint?

There is nothing in the record to suggest that the Authority was motivated by objections to plaintiff's viewpoint. Defendant argues that it limited participation in the debate to qualified candidates, in accordance with N.J.S.A. § 44A-45, and that plaintiff was not invited to participate because she was not a qualified candidate. This itself is a viewpoint-neutral reason for excluding plaintiff from the debates. Plaintiff points out that the Authority focussed mainly on the major party candidates, and paid relatively little attention to independent candidates. However, the record suggests that the Authority saw such an apportionment of its air time as consistent with its public responsibilities and statutory obligations. *Answers To Interrogatories,* ¶ 3.

The Court notes that plaintiff's candidacy placed a heavy emphasis on the rights of children and special education. *Plaintiff's Cross-Motion For Summary Judgment And Denial Of Defendant's Motion To Dismiss,* Exhibits E-F, H. These are far from unpopular views; it is safe to assume that they enjoy broad support throughout the state. There is nothing in the record to suggest that the Authority objects to children's rights or the provision of special education-related services. Therefore, the record does not support an inference that the Authority discriminated against plaintiff because of her views.

Accordingly, defendants' motion for summary judgment is granted as to plaintiff's federal constitutional claims.

### 3b. Plaintiff's Cross-Motion For Summary Judgment

Plaintiff cross-moves for summary judgment on the grounds that the Authority was legally bound by standards of balance and fairness to grant airtime to plaintiff and to similarly situated independent candidates. Plaintiff's cross-motion for summary judgment is based on several cases that are irrelevant for present purposes. Plaintiff claims that the Authority was bound, as an FCC licensee, to make "reasonable judgments in good faith on the facts before it." *Polish*

*American Congress v. F.C.C.,* 520 F.2d 1248 (7th Cir.1975). *American Security Council Ed. Foundation v. F.C.C.,* 607 F.2d 438 (D.C.Cir.1979) seems to support an argument that the Authority was bound by standards of reasonableness and prudence in its campaign coverage. Plaintiff further argues that a broadcast licensee is required to make free air time available to those holding what she describes as responsible conflicting views. *National Broadcasting Company, Inc. v. F.C.C.,* 516 F.2d 1101 (D.C.Cir.1974). These cases all concern federal statutory rights, and involve direct appeals to the Court of Appeals from FCC administrative rulings. As stated above, this Court is dismissing plaintiffs' federal statutory claims for failure to state a cause of action, there being no private right of action under the Federal Communications Act.

Plaintiff, citing *Vote Choice, Inc. v. Di Stefano,* 814 F.Supp. 195 (D.R.I.1993) claims that government-controlled media resources must be open to both publicly and non-publicly funded candidates alike. *Vote Choice* was an action challenging several provisions of a Rhode Island campaign finance law. The provisions at issue attempted to regulate and/or prohibit certain contributions and expenditures with respect to corporations, political action committees, and publicly financed candidates. *Vote Choice* held, in pertinent part, that the law's free television provisions, which provide free television advertising as an incentive to accept public funding, may be interpreted consistently with the "equal opportunity provisions of 47 U.S.C. section 315." As stated above, there are no equal time provisions in the relevant state law, and plaintiff has not exhausted her remedies regarding the analogous federal statutes. Therefore, the Court finds that *Vote Choice* does not support a convincing claim for judgment as a matter of law.