775 A.2d 778

MARILYN ARONS, PLAINTIFF–APPELLANT, v.
NEW JERSEY NETWORK, STATE OF NEW
JERSEY, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted February 13, 2001—Decided July 19, 2001.

Before Judges WEFING, CUFF and LISA.

Marilyn Arons, appellant pro se.

*John J. Farmer, Jr.*, Attorney General, attorney for respondent (*Mary C. Jacobson*, Assistant Attorney General, of counsel; *Sarah T. Darrow*, Deputy Attorney General, on the brief).

The opinion of the court was delivered by

WEFING, J.A.D.

In this case we are called upon to consider the role of New Jersey Public Broadcasting Authority (Authority) in deciding how to fulfill its responsibility to provide news coverage to the citizens of New Jersey of our gubernatorial elections as well as the role of the courts in reviewing those journalistic decisions of the Authority. The trial court, after nine days of trial in this non-jury matter, granted defendant's motion to dismiss at the end of plaintiff's case under Rule 4:37–2(b). After reviewing the record and considering the arguments advanced on appeal, we affirm.

This litigation is an outgrowth of the 1993 New Jersey gubernatorial contest, in which Christine Todd Whitman, the Republican candidate, ultimately defeated then-governor James J. Florio, who was seeking re-election as the nominee of the Democratic Party. For reasons that are unclear, the 1993 election drew a large number of independent candidates for governor, seventeen in all. Plaintiff was one of those seventeen. Some of these seventeen were the representatives of organized political parties, such as the Libertarians and the Socialist Workers. Plaintiff's campaign, on

the other hand, was not affiliated with a particular political party at all; she ran under the slogan "Maximum Citizen Involvement."

Plaintiff had been active in political matters for a number of years; eventually she concentrated her involvement on issues related to education. In 1977, she founded the Parent Information Center (PIC), a non-profit organization which provided information and assistance to parents of handicapped children seeking to meet their children's educational needs. Plaintiff operated PIC from her home in Teaneck.

Plaintiff was unhappy with the approach taken by the two major parties regarding questions of educational policy and reform and decided to enter the 1993 gubernatorial contest. She felt that her years of advocacy provided her with some name recognition among people familiar with questions of educational policy and a base from which to work. She advocated abolishing the Department of Human Services and merging its budget and staff with the Department of Education. She favored utilizing the schools on a twelve-month basis to provide, in addition to increased schooling, day care and health care for the community.

Plaintiff was of the view that her candidacy was upsetting to individuals in the education "establishment" and to attorneys. According to plaintiff, attorneys were upset with her because, through her work with PIC, she had advanced the concept of non-lawyer representation and advocacy.

To support her contention that her candidacy was upsetting to some, she pointed to an incident she said had occurred a few years earlier. According to plaintiff, she learned of corruption in the 1980s within the state Department of Education with respect to the manner in which the Department handled federal funds targeted for special education. Plaintiff's allegations reached the Federal Bureau of Investigation and she said she was asked to wear a "wire" to assist its investigation. She said concern for her safety and that of her family led her to decline the Bureau's request. She said that she had received telephone threats urging her to drop the matter.

Once plaintiff determined to enter the gubernatorial race, she severed her ties with PIC so as not to jeopardize its independent, non-profit status. Her husband served as her campaign manager and campaign treasurer; her campaign office was in their home. They campaigned every evening and every weekend across the state. Over the course of the campaign, she raised approximately $7,400.

Her campaign, however, did not generate much news coverage. Indeed, in a failed attempt to generate such coverage, she and her husband set up a campaign post early one morning at an entrance onto Route 4 in Teaneck. They knew that their actions in selecting that site would have the result of backing up commuter traffic approaching the George Washington Bridge and believed they would, in consequence, be arrested. Their arrest, they believed, would lead to news coverage of her campaign. The police, however, took the view that the two were exercising their First Amendment rights and declined to arrest them; the only result of their action was a series of angry calls from commuters who had been inconvenienced.

Defendant Authority operates a public television network for the state, New Jersey Network (NJN). Plaintiff believed that NJN was not providing fair, equal and balanced coverage of the campaign because it was focusing almost exclusively on Mrs. Whitman and Mr. Florio, with practically no coverage of the remaining seventeen candidates.

On October 20, 1993, plaintiff filed an action against the Authority and others in the United States District Court for the District of New Jersey. In that federal suit, she complained of the Authority's allegedly unfair news coverage of the campaign. The District Court ultimately dismissed this complaint, concluding that her federal constitutional claims were insufficient and that a federal court should not address her state law claims. *Arons v. Donovan*, 882 *F.Supp.* 379 (D.N.J.1995). Shortly after the District Court dismissed her federal action, she filed the instant matter in state court.

The trial of this matter spanned nine days. Plaintiff called a variety of witnesses, including William Jobes, the director of news and public affairs at NJN, Michael Aron, the senior political correspondent for NJN, Michael Scully, another of the independent candidates in the 1993 race, her husband, and herself. She also called Madeleine Koszyk, who testified as an expert on the political process in New Jersey and the political issues concerning the gubernatorial campaign in 1993. Ms. Koszyk expressed the opinion that plaintiff's candidacy posed a threat to the Whitman and Florio campaigns, particularly in light of the extremely narrow margin of some 1,700 votes by which Governor Florio had been defeated in an earlier campaign by his predecessor, Governor Kean. According to Ms. Koszyk, a candidate who had the potential to garner 1,700 votes would be seen as a threat by both the Republican and Democratic parties.

Plaintiff, in her testimony, also contended that her candidacy posed a threat to the Whitman and Florio campaigns. She referred to an incident that occurred in August 1993. *N.J.S.A.* 19:44A–37 requires the several county clerks to print and circulate with the sample ballot a statement prepared by each of the gubernatorial candidates; the statement may not exceed five hundred words in length.

In light of the large number of candidates in the 1993 election, the county clerks filed an action to be relieved of this statutory requirement.[1] Plaintiff attended the hearing, as did Peter Verniero, who was then counsel to Mrs. Whitman's campaign. Plaintiff testified that Mr. Verniero (now Justice Verniero) complimented her on her presentation. Mr. Verniero handed plaintiff his business card and was, she said, "extremely friendly." She continued:

it was my understanding that Christie Wittman [sic] wanted me to drop out of the campaign and had asked Mr. Veniero [sic] if I would meet with her, and I asked

---

[1] There is no indication in this record that the clerks were successful. The opinion in *Arons v. Donovan, supra,* 882 *F.Supp.* at 382, refers to the clerks allegedly failing to send these statements to absentee voters.

does that mean I have to drop out of the campaign and my recollection is that he either nodded his head or said yes.

I can't say which, but my clear understanding was that I would meet with Christie Wittman [sic] to work on her campaign if I dropped out of the election.

Mr. Scully testified that he contacted NJN to complain about the lack of coverage it was affording the seventeen other candidates in the race. There was testimony that another independent candidate, John Kucek, also complained.

NJN did contact the other seventeen independent candidates and invited each of them to come to its studios to tape a five-hundred-word statement explaining his or her candidacy. These taped statements were broadcast on two successive evenings one week before the election. Plaintiff accepted the invitation but, she maintained, the lighting provided was inadequate and the setting stilted. She also asserted that the time NJN selected to run the broadcasts was not designed to capture the widest audience.

According to the record presented to us, plaintiff was afforded several opportunities during the campaign to communicate with the voters of the State on a mass level. She appeared on Channel 10, a local cable channel, for an interview as well as on NJN to make the five-hundred-word statement about her candidacy that we discussed earlier; *The Philadelphia Inquirer* carried a newspaper report in advance of that second appearance. We have earlier referred to the statutory provision calling for the county clerks to print and circulate to the voters her statement about her candidacy.

2,554,190 ballots were cast in the 1993 election; Governor Whitman defeated Governor Florio by 26,093 votes. The independent candidates garnered 59,809 votes; of these, 2,884 ballots were cast for plaintiff.

I

A.

Our analysis of plaintiff's claims must start with the principles enunciated by the Supreme Court in *McGlynn v. New Jersey*

*Public Broadcasting Authority,* 88 *N.J.* 112, 439 *A.*2d 54 (1981). That case commenced as a challenge to the decision by NJN to exclude Richard B. McGlynn, a candidate in the Republican primary for its nomination for governor, from participation in the program, "A Closer Look," scheduled to be broadcast during the final week of the 1981 gubernatorial primary campaign. The Court ultimately rejected his challenge. In doing so, it noted:

> that the Authority has been given a wide range of journalistic freedom ... in determining the content and scope of television broadcast coverage of gubernatorial election campaigns. This freedom has been given ... to effectuate the significant public policy goal of providing the people of New Jersey with needed coverage of the subjects and events which most directly affect them. The Authority, though a governmental instrumentality, is intended by the Legislature to exercise its discretion with the independence and freedom that characterize a free and vibrant press. At the same time, its important responsibilities are to be discharged within a framework of fairness and impartiality comporting generally with prevailing federal regulatory philosophy.

> [*McGlynn, supra,* 88 *N.J.* at 116–17, 439 *A.*2d 54.]

In approaching the question presented to it, the Court noted the history behind the legislative decision to establish the New Jersey Broadcasting Authority, including the minimal coverage historically afforded news relating to New Jersey by New York and Philadelphia stations, as well as the high cost to political candidates of securing advertising time on those stations. *Id.* at 122–25, 439 *A.*2d 54. The Court noted the crucial role the Authority plays in fulfilling the policies expressed in the Campaign Contributions and Expenditures Reporting Act, *N.J.S.A.* 19:44A–1 to 47, as well as the Authority's statutory obligation to act with balance, fairness and equity. *Id.* at 124, 439 *A.*2d 54 (citing to *N.J.S.A.* 48:23–7(h)). "The Authority cannot endorse candidates or legislation and it cannot actively use its stations to advance its views on the public issues of the day. The Legislature envisioned full, balanced discussion of public issues." *Id.* at 126, 439 *A.*2d 54. The Court also acknowledged the editorial discretion vested in the Authority but concluded that despite its

> wide discretion in determining broadcast content ... with respect to coverage of a gubernatorial campaign, it is required by New Jersey statute to promote full discussion of the issues by the candidates, consistent with "balance, fairness and equity."

[*Id.* at 132, 439 *A*.2d 54.]

According to the Court,

[t]he touchstone is basic fairness, and the Authority is to have substantial discretion to determine what is fair in light of its journalistic judgment. This discretion is to be even wider in the case of newscasts, news interviews, news documentaries and coverage of news events. A candidate wishing to challenge the Authority's coverage of a gubernatorial campaign will be required to prove that the Authority's coverage, examined over the entire course of the campaign, has been or threatens to be unreasonably imbalanced.

[*Id.* at 146–47, 439 *A*.2d 54.]

Finally, the Court recognized the sensitive nature of the inquiry; it stressed that judicial involvement in such questions should be "rare." *Id.* at 148, 439 *A*.2d 54.

## B.

The United States Supreme Court has also been called upon to decide whether a public television station must allow an independent candidate to participate in a station-sponsored debate during a campaign. The Court concluded it need not. Writing for the Court, Justice Kennedy said:

As a general rule, the nature of editorial discretion counsels against subjecting broadcasters to claims of viewpoint discrimination. Programming decisions would be particularly vulnerable to claims of this type because even principled exclusions rooted in sound journalistic judgment can often be characterized as viewpoint-based. To comply with their obligation to air programming that serves the public interest, broadcasters must often choose among speakers expressing different viewpoints.... Were the judiciary to require, and so to define and approve, pre-established criteria for access, it would risk implicating the courts in judgments that should be left to the exercise of journalistic discretion.

[*Arkansas Educ. Television Comm'n v. Forbes*, 523 *U.S.* 666, 673–74, 118 *S.Ct.* 1633, 1639, 140 *L.Ed.*2d 875, 884 (1998).]

## C.

There have, in addition, been a series of federal court cases challenging the decisions of state public television networks in covering political contests within their states. *DeBauche v. Trani*, 191 *F*.3d 499 (4th Cir.1999), *cert. den.*, 529 *U.S.* 1033, 120 *S.Ct.* 1451, 146 *L.Ed.*2d 337 (2000), (Reform Party gubernatorial candidate in Virginia who was excluded from debate failed to state a

cause of action under 42 *U.S.C.A.* § 1983); *Marcus v. Iowa Public Television,* 97 *F.*3d 1137, 1141 (8th Cir.1996) (application to compel defendant to permit independent Congressional candidates to appear with major party Congressional candidates on the program "Iowa Press" denied, the court stating defendant was "a media organization, which necessarily must make editorial decisions regarding the content of its programming. Interference with that editorial discretion constitutes a significant injury to ... [its] editorial integrity ... which interferes with their primary mission of serving the public."); *Chandler v. Georgia Public Telecommunications Comm'n,* 917 *F.*2d 486 (11th Cir.1990), *cert. den.,* 502 *U.S.* 816, 112 *S.Ct.* 71, 116 *L.Ed.*2d 45 (1991) (public television's exclusion of Libertarian candidates from debates during campaign for governor and lieutenant governor upheld). Other cases have recognized the limited relief available against private broadcasters. *Johnson v. F.C.C.,* 829 *F.*2d 157 (D.C.Cir.1987) (exclusion of nominees of the Citizens Party from participating in the 1984 presidential debate did not prevent them from waging an effective campaign or deny voters their First Amendment right to vote); *Kennedy for President Comm. v. F.C.C.,* 636 *F.*2d 417 (D.C.Cir. 1980) (coverage of President Carter's news conferences did not confer upon an opposing candidate for the Democratic presidential nomination the right to respond.)

Finally, we note that in *Forbes, supra,* the Supreme Court made no distinction in its analysis between private, for-profit broadcasters and public broadcasters such as defendant. Some commentators have concluded from that omission that the Court considers public broadcasters to have the same editorial discretion vested in private broadcasters. Francis J. Ortman, III, Note, *Silencing the Minority: The Practical Effects of Arkansas Educational Television Commission v. Forbes,* 49 *Cath. U.L.Rev.* 613, 627 (2000). Others have concluded that the result of the Court's decision in *Forbes* is to subject public broadcasters to even less regulation than commercial broadcasters. Kyu Ho Youm, *Editorial Rights of Public Broadcasting Stations v. Access for Minor Political*

*Candidates to Television Debates,* 52 *Fed. Comm. L.J.* 687, 723 (2000).

## II

██ We perceive a crucial distinction between the nature of the claim plaintiff asserts in this matter and the claims presented in the cases she cites to us as well as those we have located in our own independent research. Plaintiff does not assert that she was denied participation in a defined forum, such as a candidates' debate or a particular broadcast; rather, she challenges the overall coverage provided to the 1993 gubernatorial campaign by NJN. In noting this distinction, we express no opinion on whether plaintiff could have successfully asserted such a right to participate in light of the limitations of *N.J.S.A.* 19:44A–45, which mandates debates during a gubernatorial election among "qualified candidates." Manifestly, plaintiff did not meet the criteria to be considered a "qualified candidate" during that election. *N.J.S.A.* 19:44A–3m. Rather, we consider it important to note the broad scope of the issue that plaintiff has framed for the court. As plaintiff noted in arguing against the Authority's motion to dismiss, she sought from the court a ruling "defining what constitutes equitable programming in the public interest."

We have concluded, however, that such a ruling would represent an unwarranted intrusion into the journalistic discretion of the Authority. We reach this conclusion for several reasons. We note, for instance, the admonition of Justice Pashman in *McGlynn, supra,* that the Authority's "substantial" discretion is "even wider in the case of newscasts, news interviews, news documentaries and coverage of news events." 88 *N.J.* at 147, 439 *A.*2d 54. It is just such coverage that plaintiff challenges here.

We also note that our legislature, in providing for debates among gubernatorial candidates, has drawn the applicable statutes in such a manner that not all independent candidates have a right to participate. *N.J.S.A.* 19:44A–3m defines a "qualified candidate" in terms of the candidate's ability to deposit and spend a threshold

level of funds, at least $150,000. As we noted earlier, plaintiff would not have been considered a "qualified candidate" in the course of this election in light of her limited fund-raising success. We interpret the legislative decision to enact such a threshold limitation as an indication that the legislature concurs with the view that "inclusion of all ballot-qualified candidates would 'actually undermine the educational value and quality of debates.' " *Forbes, supra,* 523 *U.S.* at 681, 118 *S.Ct.* at 1643, 140 *L.Ed.*2d at 889 (citing *Twentieth Century Fund Task Force on Presidential Debates, Let America Decide* 148 (1995)).

In addition, the Legislature has clearly indicated that it views the issue as one which cannot be handled by mathematical comparisons of broadcast time allocations. In an earlier formulation, *N.J.S.A.* 19:44A–39 required the Authority to utilize a specified amount of broadcast time for gubernatorial candidates. *McGlynn, supra,* 88 *N.J.* at 125, n. 8, 439 *A.*2d 54. The Legislature has seen fit, however, to remove such shackles; the statute now merely directs the Authority to "promote full discussions of public issues by the candidates...." Chief Justice Wilentz discusses the history of this amendment in his concurring opinion in *McGlynn, supra,* 88 *N.J.* at 156–60, 439 *A.*2d 54.

In our judgment, the statutory language selected by the Legislature to describe the role of the Authority further supports the trial court's conclusion. The statute directs the Authority to "promote full discussions of public issues by the candidates," not to promote full discussions by the candidates of public issues. *N.J.S.A.* 19:44A–39. This indicates to us that the Legislature's objective was the discussion of issues, rather than that particular individuals be involved in those discussions.

Further, we are also cognizant of Justice Pashman's concluding observation in *McGlynn,* "We do not envisage any supervisory role by the Judiciary in the broadcast field." *Id.* at 148, 439 *A.*2d 54. We are convinced that plaintiff, through this litigation, seeks to have us take on such a role. Such a role, however, is not one for which the courts are particularly well-suited, even recognizing

the particular sensitivity that must be exercised when the First Amendment rights of candidates and their supporters are involved. *Johnson v. F.C.C.*, *supra*, 829 *F.*2d at 161. The difficulty in assessing the balanced nature of programming decisions on public issues is, for example, illustrated by *American Security Council Education Foundation v. F.C.C.*, 607 *F.*2d 438 (D.C.Cir. 1979), *cert. den.*, 444 *U.S.* 1013, 100 *S.Ct.* 662, 62 *L.Ed.*2d 642 (1980), in which the court rejected a challenge to the overall fairness of CBS's coverage of the issue of national security, in part, because "national security" was not a particular, well-defined issue but rather an umbrella, encompassing a number of sub-issues.

■ Finally, we concur with the trial court's analysis of the substance of much of the evidence plaintiff presented. In doing so, we in no way disparage plaintiff, her commitment to educational opportunity for all or her attempts to promulgate her ideas. It is apparent, however, that much of her claims at trial rest upon her own speculation about the actions and motives of others. Even under the generous standards governing motions under *R.* 4:37–2(b), *Caputo v. Nice–Pak Products, Inc.*, 300 *N.J.Super.* 498, 505–506, 693 *A.*2d 494 (App.Div.), *certif. den.*, 151 *N.J.* 463, 700 *A.*2d 876 (1997), that Governor Whitman's campaign counsel may have spoken to her in a friendly manner on one occasion simply cannot be considered the equivalent of an attempt to have plaintiff withdraw from the campaign due to concern about the potential impact of plaintiff's candidacy.

■ Other than plaintiff's own assertions, there is no evidence that the programming decisions of NJN were anything other than the result of its own considered editorial judgment of what was newsworthy. Plaintiff points to NJN's admission in its answers to plaintiff's interrogatories that it had decided not to include as an item of news that plaintiff had filed suit in federal court seeking to enjoin the November 1993 election; there is no competent evidence, however, that that decision sprang from nefarious or im-

proper motives. Courts, moreover, have recognized that broadcast stations must make choices.

When state officials operate a public television station they must necessarily make discriminating choices. "[F]or better or worse, editing is what editors are for; and editing is selection and choice of material." In exercising their editorial discretion state officials will unavoidably make programming decisions which can be characterized as "politically motivated." All television broadcast licensees are required, under the public interest standard, to cover political events and to provide news and public affairs programs dealing with the political, social, economic and other issues which concern their community. The licensees are thus required to make the inherently subjective determination that their programming decisions are responsive to the needs, problems and interests of the residents of the area they serve.

[*Muir v. Alabama Educ. Television Comm'n*, 688 *F*.2d 1033, 1044 (5th Cir.1982), *cert. den.*, 460 *U.S.* 1023, 103 *S.Ct.* 1274, 75 *L.Ed.*2d 495 (1983), (quoting *Columbia Broad. Sys., Inc. v. Democratic Nat. Comm.*, 412 *U.S.* 94, 124, 93 *S.Ct.* 2080, 2097, 36 *L.Ed.*2d 772 (1973)) (citations omitted).]

## III

■ Plaintiff also maintains that the trial court erred in not finding the Authority to have violated the federal fairness doctrine and her First Amendment rights. We agree with the Authority, however, that these federal claims are precluded in light of the disposition of the earlier federal litigation.

■■ Finally, plaintiff complains of the quality of the letter opinion provided by the trial court. First, appeals are taken from judgments, not opinions. *Saltzman v. Saltzman*, 290 *N.J.Super.* 117, 123, 675 *A.*2d 231 (App.Div.1996). Quality, moreover, is not measured by length but rather by the nature of the analysis undertaken. We have no grounds to quarrel with the manner in which the trial court concluded this contentious dispute.

The judgment under review is affirmed.