# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5598-18

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

R.O.[1] and A.O.,

      Defendants,

and

T.A.,

      Defendant-Appellant/
      Cross-Respondent.

_____

IN THE MATTER OF
L.A.O., J.O., D.O., and O.O.,
Minors/Cross-Appellants.

_____

Submitted February 9, 2021 – Decided March 3, 2021

---

[1] We use initials pursuant to Rule 1:38-3(d)(12).

Before Judges Haas, Mawla, and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FN-07-0141-19.

Joseph E. Krakora, Public Defender, attorney for appellant/cross-respondent (Robyn A. Veasey, Deputy Public Defender, of counsel; Victor E. Ramos, Assistant Deputy Public Defender, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; Sara K. Bennett, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors/cross-appellants (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Cory H. Cassar, on the brief).

PER CURIAM

T.A. appeals from an April 10, 2019 order entered following a factfinding hearing which found he abused his niece L.A.O., pursuant to N.J.S.A. 9:6-8.21(c). The Law Guardian, on behalf of L.A.O. and her siblings, T.O., J.O., and O.O., cross-appeal also challenging the trial judge's findings. We affirm.

We take the facts from the record of the factfinding hearing. R.O. and A.O. are the biological parents of the children. A.O. resides abroad and his brother T.A. resides with R.O. and serves as a father figure to the children.

The underlying incident occurred on October 16, 2018. L.A.O. was seventeen at the time and a high school senior. She had good grades, but R.O. was concerned about her socializing habits, which R.O. believed were contrary to the family's custom and cultural values.

On October 17, 2018, the Division of Child Protection and Permanency (Division) received a referral from L.A.O.'s school stating the child appeared in school wearing sunglasses and when she removed them, it revealed her right eye was swollen shut. The reporter relayed the child said she arrived home at 8:00 p.m. the previous night and informed R.O. she was at a game. She was told to wash the dishes and T.A. told her to write down what she did that day. R.O. asked her for her cell phone as well. When L.A.O. refused to hand over the phone, T.A. slapped and punched her several times in the head while R.O. took the phone. L.A.O. also stated her siblings witnessed the incident and begged T.A. to stop hitting their sister. The child relayed this story to her teacher, school nurse, and school social worker.

L.A.O. stated she did not want to return home and R.O. wanted her to leave, but she was sleeping on the couch. The school nurse recommended L.A.O. go to the hospital.

3

The Division investigator traveled to the hospital and interviewed the physician who assessed L.A.O., and learned she was in the hospital eye clinic. There, the investigator interviewed L.A.O. and R.O., and photographed L.A.O.'s injury. L.A.O. informed the investigator she stayed after school to watch a game with friends and arrived home late in the evening. When she entered the home, R.O. and T.A. asked her where she had been and why she had not responded to their calls, but L.A.O. refused to answer them. L.A.O. repeated what she previously said to school staff regarding having to wash the dishes and write down her activities for the day. She was told to put her phone on the couch. She stated she finished writing and went to the kitchen. R.O. then asked L.A.O. for her phone, which L.A.O. had put in her pocket. R.O. then began to hit L.A.O. on her legs and backside with a belt. When L.A.O. refused to give the phone to her mother, T.A. became involved and slapped L.A.O. with an open hand across the right side of her face. As L.A.O. attempted to flee to her room, T.A. grabbed her around the waist and attempted to hold her arms so her mother could take the phone. L.A.O. responded by hitting and kicking R.O. and throwing a chair at T.A. L.A.O. told the investigator the last time she was physically disciplined was by her mother when she was twelve and the punishment was not as severe as she experienced with T.A.

A-5598-18

When the investigator spoke with R.O. about the incident she explained she was upset because L.A.O. did not ask for permission to go to the game and came home late without explanation, which was a common occurrence. She stated L.A.O. was sending and receiving nude photos with men on social media. She repeated the essential facts of the underlying incident and stated she asked L.A.O. four or five times for her phone, but she refused to give it to her and admitted to striking L.A.O. multiple times with a belt. As the scuffle ensued, she stated T.A. held the child by the waist to enable R.O. to take the phone. She stated the phone fell on the floor and L.A.O. must have injured her eye as she, R.O. and T.A. attempted to retrieve it; she denied that T.A. beat L.A.O.

L.A.O. was discharged from the hospital the same day. The hospital records described the injury as having been caused by a blunt or sharp blow to the eye or surrounding structures, which would heal in approximately two weeks. The prognoses indicated potential complications, including vision loss, infection, and cataracts. L.A.O. was prescribed antibiotic eye drops to prevent infection and referred to an eye specialist. The Division also referred L.A.O. to the Regional Diagnostic Treatment Center (RDTC), for a follow-up medical appointment, and a psychosocial assessment.

5

The investigator interviewed fifteen-year-old J.O. who recounted the incident the prior evening. He reported he heard R.O. ask L.A.O. for the cell phone multiple times and heard her hitting L.A.O. with a belt. He went downstairs to intervene and saw L.A.O. fighting with R.O. and T.A. and saw T.A. hit L.A.O. repeatedly in the face. Then he saw R.O. retrieve the phone and L.A.O. went to her room. When the investigator asked J.O. when he or his siblings were last physically disciplined, he could not recall.

During her interview with the investigator, R.O. agreed to contact the Division to take L.A.O. to the police station the next day to file a report. The Division followed up with R.O. regarding the trip to the police station and learned R.O. had already taken L.A.O., and that L.A.O. told the police she had fallen and hurt herself.

In November 2018, the RDTC completed a psychosocial evaluation of L.A.O. The evaluator noted she described the incident in a similar fashion as she reported to school and hospital staff and the investigator, but stated the phone was in her hand when it hit her face. She told the RDTC evaluator she lied about T.A. hitting her because she was upset and was unaware of the consequences.

6

T.A. refused to be interviewed by the Division and denied hitting L.A.O. R.O. refused to make D.O. and O.O. available for an interview.

The Division's summary noted it established R.O. for "[p]hysical [a]buse-[p]hysical [i]mpairment [i]ncident [of L.A.O.] without [i]njury" and substantiated T.A. for "[p]hysical [a]buse- [c]uts, [b]ruises, [w]elt, [a]brasion, [o]ral [i]njury" of L.A.O. The Division filed a complaint seeking care and supervision of the children pursuant to N.J.S.A. 9:6-8.21 and N.J.S.A. 30:4C-12.

At the factfinding hearing, the Division presented the testimony of its investigator, and T.A. called L.A.O. and J.O. as his witnesses. The trial judge rendered comprehensive oral and written determinations, including credibility findings.

The judge found the investigator's testimony was "highly credible[,] authentic[,] clear[, and] professional . . . ," noting she answered questions "directly[,] concisely[, and] candidly articulated her" experience with the family. The judge found the investigator testified consistently with her report. Noting the investigator had worked for the Division for fifteen years, the judge credited the investigator's explanation for the discrepancy in L.A.O.'s versions

7

of the events, that "in her experience, the first report of a child is often the most honest version of events."

Conversely, the judge found L.A.O.'s testimony "fraught with discrepancies" and was "inauthentic [and] not credible." She noted she "often contradict[ed] herself and was unable to clarify several of her responses." The judge found L.A.O. "lack[ed] confidence in her own responses" and found her testimony "unclear" and at times, she was "unable to respond to the question asked because she could not recall the answer." The judge concluded L.A.O.'s initial disclosure was the "most credible . . . due to its repetition, the time in which she made the disclosure, the consistency with her injury and the corroboration of her brother J[.O.]." The judge further stated:

> At no time during [L.A.O.'s] testimony did she state that she was angry the next morning at [T.A.] or her mother, only that she was upset that she had the injured eye. It is highly understandable if she were upset by the altercation or upset at how she received the eye injury, but she never admitted to this, although asked repeatedly. It is clear to the court that she did not testify honestly about what occurred on the night of the incident. Nor did she ever offer a clear explanation for her actions. Throughout her testimony she did not describe or evidence any emotions that would logically follow an altercation that led to the injury she sustained. She instead testified that she was upset only that the Division was involved with her family.

A-5598-18

[L.A.O.]'s version of the events in her testimony differed from her initial disclosure in that she stated that she went downstairs to do the dishes, her mother hit her with a belt and then there was a struggle for the phone. She testified that she went to go upstairs and that [T.A.] was trying to get her off the stairs "for [her] safety." She also testified that her mother asked [T.A.] to help take possession of the phone. [L.A.O.] testified that this is when she hit herself in the eye with the phone, when she was twisting and turning to get away from [T.A.]. When describing how the phone hit her, she did not clarify how a force was applied to the phone that would result in the serious injury to her eye.

In addition, this court does not find her testimony credible regarding [T.A.] trying to get her off the stairs "for [her] safety". She testified that there are many boxes near the stairs that could have fallen and possibly injured her. Though this may be true, the court does not find it likely that this is why [T.A.] had to stop her from going up the stairs. In fact, if this were true, logic would dictate that it would have been safer for [T.A.] and [R.O.] to wait until [L.A.O.] had gone up the stairs to try [to] retrieve the phone from her. [L.A.O.] further testified that she told the school staff, who first approached her about her eye injury, the version of events that she testified to in court (that [T.A.] didn't hit her). She then testified that after this disclosure she changed her story and began telling the version of events initially reported to the Division (that [T.A.] did hit her).

During cross examination by the [Deputy Attorney General (DAG)], [L.A.O.] was asked why she chose to change her story and why she did so in such a short period of time. [She] could not provide an answer for her actions. The DAG then asked [L.A.O.], if the punch or slap occurred before or after her mother hit

9

her with a belt. [L.A.O.] replied, "Before." This answer was in direct contrast with her prior testimony, and in fact aligns with her original disclosure to the Division.

The judge concluded L.A.O.'s testimony was "inauthentic, untruthful, and directly evasive of the actual nature and degree of the altercation that occurred on that night."

The judge also found J.O.'s testimony "very evasive" and his "reserved" demeanor and "very short nondescript responses" indicative his testimony was "highly insincere and contradictory." She stated:

> [J.O.'s] testimony is in direct conflict with his earlier statements made to the Division. The court finds his testimony to be very selective with what he did and did not remember. During [J.O.'s] testimony, he stated five separate times that he "could not recall" the events of the night of the incident. The details that he could not remember were those that directly relate to how [L.A.O.] was disciplined and the scuffle that occurred between [L.A.O.], [T.A.], and [R.O.]. He was however able to recall statements he made to . . . [the investigator] that did not directly relate to [L.A.O.'s] injury . . . . When asked on direct about his report to . . . [the investigator] the day following the incident, he stated that he unlocked the door for [L.A.O.] but did not go down[]stairs again. He testified that he told . . . [the investigator] that he did not see [T.A.] hit [L.A.O.]
>
> On cross examination, [J.O.] testified that he did not go downstairs except to open the door for [L.A.O.] When asked if he heard [L.A.O.]'s voice when she came in, he reported that he did and that he heard [T.A.] greet

10

her back, despite previously testifying that he only heard noises not conversations. When asked by the DAG about his statements in the report where he told the case worker about a scuffle between [L.A.O.] and the defendants, he states that he didn't see this and he didn't go downstairs. He stated he didn't make these statements to . . . [the investigator].

The judge concluded it was "highly unlikely that he would report a false story to . . . [the investigator] the morning after the incident when it was fresh in his mind, and a more truthful story during his testimony weeks later," and found his testimony "highly inauthentic and simply not credible."

The judge concluded the Division did not prove R.O. had committed abuse or neglect. The judge reached the opposite conclusion regarding T.A., stating:

> Here, [T.A.'s] exercise of excessive corporal punishment meets the statutory criteria in Title 9. The law states that inflicting unnecessary severe corporal punishment on a child constitutes abuse. N.J.S.A. 9:6-1. In fact, any act or omission that results in unnecessary physical suffering to a child constitutes abuse. Ibid. Engaging in an altercation with a misbehaving child that results in the child sustaining an eye injury clearly falls under Title 9.
>
> [L.A.O.] sustained a serious injury to her right eye, depicted in the photos taken the day following the incident . . . . The blow she received from [T.A.] caused her eye to swell and bruise, requiring her to be transported to the emergency room to be treated. She was ultimately referred to an eye clinic at the hospital due to the seriousness of her injury. [L.A.O.] did state that she had experienced physical discipline in the past,

11

however she did not describe receiving as serious an injury as a swollen and bruised eye. Even if [L.A.O.'s] injuries were the result of a one-time incident, the injury to her eye caused serious swelling and bruising that would take a significant amount of time to heal. Her injury also included possible complications such as vision loss, infection[,] and cataracts.

In cases of corporal punishment courts look to the nature of the injury that the child sustains. In New Jersey Div[ision] of Youth & Family Serv[ices] v. R.S., 187 [N.J.] 491 (2006), the Court found that because the grandmother left a mark on her grandchild, she abused him under the law. Here there is more than a mere mark. [T.A.'s] actions resulted in [L.A.O.] sustaining a severely swollen and injured eye. His actions easily meet the burden set by R.S.

Further, intent is not determinative of a finding of abuse and neglect under Title [Nine]. In G.S.[ v. New Jersey Division of Youth & Family Services, 157 N.J. 161, 177 (1999)], the Court found that the party who inflicted excessive corporal punishment on a child did not have to have intended harm to be found liable under the law. Here, [defendant] might not have intended to seriously injure [L.A.O.'s] eye, but based on the evidence before the court[, i]t is clear that her injury was the result of his actions.

Regarding [L.A.O.'s] part in the struggle and her behavior leading up to the struggle, this court does not find her involvement to diminish the actions of [T.A.]. In cases where older children are actively involved in altercations with their parents, courts have held that an inquiry into each party's strengths and injuries is necessary to determine the existence of abuse. In New Jersey Div[ision] of Youth and Family Services v. M.C. III, 201 N.J. 328, (2010[]), the [C]ourt found abuse and

12

neglect by a father who engaged in an altercation with his two teenage children who were significantly smaller than he was, and which resulted in him grabbing his son by his neck. Id. [a]t 336. . . . Here, it was first reported by [L.A.O.] that the altercation involved both herself[,] her mother and [T.A.] She later testified that it only involved her and [T.A.] on the stairs. [L.A.O.] testified and reported that [T.A.] held her around her waist to restrain her from going up the stairs with the phone. Whether the altercation included both [T.A.] and . . . [R.O.] or solely [T.A.], this was not an altercation of equal strengths. [T.A.] is a grown man and significantly larger than [L.A.O.] Furthermore, [L.A.O.] is the only one who suffered an injury from the altercation. Therefore, [T.A.'s] active participation in the altercation constituted abuse under the statute.

It is important that this court address [L.A.O.'s] recanting of her initial statements regarding how she sustained her injury. Though [L.A.O.] ultimately changed her story as to how the injury occurred, and later testified that [T.A.] didn't cause her eye injury, the court finds her initial disclosure that [T.A.] caused her injury to be most credible. . . . [L.A.O.'s] initial disclosure was made directly after the incident, was made to multiple people, and was corroborated the same day by . . . [J.O.]. . . . [J.O.] told the Division an almost identical story to [L.A.O.'s] original report of the incident . . . . [He] made these statements, aligning with his sister's initial disclosure, before time passed and he had an opportunity to speak with his sister, his mother, or [T.A.]. For these reasons, [L.A.O.'s] initial statements, the consistency in her initial disclosures, [J.O.'s] initial report, and the injury itself provide adequate corroboration of [L.A.O.'s] first version of events.

13

[L.A.O.] later changed her story, saying that [defendant] did not punch or slap her in the face causing the injury to her eye, but that it may have happened when the phone hit her eye. She stated this new version of events on November 19, 2018[,] at the RDTC medical evaluation . . . and on November 20, 2018[,] at the RDTC psychosocial evaluation . . . . She also testified to this new version of events, stating that she lied the first time because she was upset, and didn't understand the consequences of her lie, in that [T.A.] would have to leave the home. It is possible that [L.A.O.] didn't understand the seriousness or possible ramifications of the incident, and the subsequent involvement of the Division. However, this does not diminish the validity of her initial disclosure.

The testimony of [L.A.O.] and [J.O.] contradicted their initial disclosures to the Division. . . . Though [L.A.O.] testified that [T.A.] didn't hit her, when she was asked by the DAG if her mother hit her with a belt before or after "the punch or slap," [L.A.O.] responded quickly, "[b]efore." . . . [T]his answer is highly concerning. . . .

A constant in both the initial disclosure of events and the version [L.A.O.] testified to, is her disrespectful behavior on the night of the altercation. It has been noted in the documentary evidence and in . . . [the investigator's] testimony that [R.O.] had concerns regarding [L.A.O.'s] behavior. . . . There is no question that [R.O.] had a reason to be upset at her daughter, as any mother would. [T.A.], as a father figure to [L.A.O.], also may have been upset at [her] disrespectful and possibly reckless behavior. Despite this, [L.A.O.'s] behavior does not justify the excessive corporal punishment inflicted upon her . . . [and did] not excuse the physical altercation that resulted in the serious injury to her eye.

14

. . . [T]he question before this court is how she sustained the injury to her eye. Several variations of the altercation have been presented to the court. In each of these variation[s there] remains one constant, [T.A.'s] physical involvement with [L.A.O.] to obtain the cell phone. In light of all of the evidence submitted, based on [L.A.O.'s] initial statements, the consistent corroboration of these statements by the case worker, [J.O.'s] initial statements and the injury itself, the court finds that [T.A.] caused [L.A.O.'s] eye injury during the altercation.

The judge entered the April 10, 2019 order finding, pursuant to N.J.S.A. 9:6-8.21(c), the Division proved by a preponderance of evidence T.A. "physically abused [L.A.O.] . . . resulting in significant injury to her eye." In July 2019, the court entered an order terminating the litigation.

T.A. raises the following points on appeal:

[POINT] I. THE COURT'S FINDING OF ABUSE RESULTS FROM AN ERRONEOUS EVALUATION OF THE FACTS AND IMPLICATIONS TO BE DRAWN THEREFROM BECAUSE ITS CREDIBILITY DETERMINATIONS DO NOT RESOLVE THE FACTUAL INCONSISTENCIES IN THE RECORD [O]R ADEQUATELY ADDRESS THE NEED FOR CORROBORATION OF THE CHILDREN'S OUT-OF-COURT STATEMENTS AS REQUIRED BY TITLE [NINE].

A. Unresolved Factual Inconsistencies and the Absence of Adequate, Substantial and Credible Evidence of Abuse.

B. The [A]bsence of Adequate Corroboration to Support the Trial Court's Determination of Physical Abuse.

[POINT] II.  EVEN ASSUMING ARGUENDO THAT [T.A.] HIT [L.A.O.], THE FACTS DO NOT SUPPORT A FINDING OF ABUSE AGAINST [T.A.] BY WAY OF EXCESSIVE CORPORAL PUNISHMENT ENCOMPASSED IN N.J.S.A. 9:6-8.21(C)(4)(B).

[POINT] III.   THE COURT'S RESORT IN ITS SUPPLEMENTAL WRITTEN DECISION TO STATUTORY BASIS FOR ABUSE NOT PLED BY DCPP IN ITS ACTION AGAINST [T.A.] AND IMPLICATING OTHER AUTHORITY DEPRIVED [T.A.] OF ADEQUATE NOTICE AND AN OPPORTUNITY TO BE HEARD.

On the cross-appeal, the Law Guardian argues as follows:

[POINT I.]  THE PREPONDERANCE OF EVIDENCE DOES NOT SUPPORT A FINDING THAT [T.A.] ABUSED [L.A.O.] PURSUANT [T]O N.J.S.A. 9:6-8.21(C)(4).

POINT II[.]  THERE WAS NO EVIDENCE OF "PER SE" EXCESSIVE CORPORAL PUNISHMENT.

POINT III[.]   THE COURT DID NOT WEIGH MULTIPLE RELEVANT FACTORS.

POINT IV[.]   THE ABERRANT INCIDENT EVIDENCES A FAMILY [I]N CRISIS MERITING [T]HE DIVISION'S ASSISTANCE PURSUANT [T]O N.J.S.A. 30:4C-12.

I.

"The scope of appellate review of a trial court's fact-finding function is limited." Cesare v. Cesare, 154 N.J. 394, 411 (1998). A trial court's opinion is "binding on appeal when supported by adequate, substantial, credible evidence." Id. at 412 (citing Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)). "[T]he family court [enjoys] broad discretion because of its specialized knowledge and experience in matters involving parental relationships and the best interests of children." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 427 (2012). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Cesare, 154 N.J. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). "Because a trial court 'hears the case, sees and observes the witnesses, [and] hears them testify,' it has a better perspective than a reviewing court in evaluating the veracity of witnesses.'" Ibid. (alteration in original) (quoting Pascale v. Pascale, 113 N.J. 20, 33 (1988)).

Therefore, "[w]e do 'not disturb the "factual findings and legal conclusions of the trial judge unless . . . convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice."'" Gnall v. Gnall, 222 N.J. 414, 428 (2015)

(alterations in original) (quoting Cesare, 154 N.J. at 412). However, we do not owe the trial court's interpretation of law any special deference. N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 183 (2010) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

II.

Points I and II of T.A.'s and Points I, II, and III of the Law Guardian's briefs collectively challenge the factual and credibility determinations made by the trial court. Specifically, T.A. argues there was inadequate evidence to support the judge's findings, the judge did not resolve the inconsistent statements made by L.A.O. and R.O., and the allegations of abuse lacked corroboration. He argues the facts did not support a finding of excessive corporal punishment because there was no evidence it resulted from abuse, L.A.O. did not suffer a severe injury, and there was no history of abuse.

Similarly, the Law Guardian asserts: there was no evidence of excessive corporal punishment and the trial court did not weigh the N.J.A.C. 3A:10-7.5 factors or assess the factors under Department of Children and Families, Division of Youth and Family Services v. K.A., 413 N.J. Super. 504 (App. Div. 2010); the child's injury was not proven to be severe; and the totality of the circumstances show the injury was not the result of physical discipline, but an

accident arising from the struggle over the cellphone. The Law Guardian argues the judge did not consider that: R.O. was ill; L.A.O. was a model student, but was communicating with men against her mother's wishes; the family had no history of involvement with the Division; and it was not initially evident the child was injured.

N.J.S.A. 9:6-8.21(c) defines various circumstances that can comprise the abuse or neglect of a child. Among other things, the statute specifically covers:

> [A] child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court[.]
>
> [N.J.S.A. 9:6-8.21(c)(4)(b).]

Our Supreme Court has noted that the purpose of Title 9 is "to protect children 'who have had serious injury inflicted upon them' and make sure they are 'immediately safeguarded from further injury and possible death.'" N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 18 (2013) (quoting N.J.S.A. 9:6-8.8(a)). "The law's 'paramount concern' is the 'safety of the children,' and not

19

the 'culpability of parental conduct[.]'" Ibid. (quoting N.J.S.A. 9:6-8.8(a); G.S., 157 N.J. at 177).  "The focus in abuse and neglect matters . . . is on promptly protecting a child who has suffered harm or faces imminent danger." A.L., 213 N.J. at 18 (citing N.J.S.A. 9:6-8.21(c)(4)).

A court's finding of abuse or neglect must be based on a preponderance of the evidence when the proof is considered in its totality.  N.J.S.A. 9:6-8.46(b)(1); N.J. Div. of Youth & Fam. Servs. v. C.M., 181 N.J. Super. 190, 201 (App. Div. 1981) ("In child abuse and neglect cases the elements of proof are synergistically related.  Each proven act of neglect has some effect on the [child].  One act may be 'substantial' or the sum of many acts may be 'substantial.'").  Notably, the Title 9 proof standard is less stringent than in guardianship cases for the termination of parental rights, which must instead be proven by clear and convincing evidence.  See N.J.S.A. 30:4C-15.1(a).

We reject T.A. and the Law Guardian's contentions that there was inadequate evidence to support a finding of abuse.  L.A.O.'s injury was severe as documented by her school, the hospital, and the investigator.  Moreover, the judge painstakingly explained why she believed the initial reports by L.A.O. and J.O. respecting the incident and how L.A.O. received the injury were more credible than their subsequent attempts to change the facts after the Division's

investigation began and even while testifying. Neither T.A. nor the Law Guardian have given us cause to second-guess the judge's detailed credibility findings. Contrary to T.A.'s assertions, the judge left no issue of fact unresolved and the substantial credible evidence does not support the theory that L.A.O.'s injury was either self-inflicted or the product of an accident.

We also reject T.A. and the Law Guardian's challenge to the judge's finding there was excessive corporal punishment. In K.A. we stated:

> [A]bsent statutory, regulatory, or case law guidance, we will define "excessive corporal punishment" by referring to common usage and understanding. As a starting point, we note that the statute condemns excessive corporal punishment. The term "excessive" means going beyond what is proper or reasonable. Webster's II New College Dictionary 390 (Margery S. Berube ed., 1995). . . . [A] single incident of violence against a child may be sufficient to constitute excessive corporal punishment. A situation where the child suffers a fracture of a limb, or a serious laceration, or any other event where medical intervention proves to be necessary, may be sufficient to sustain a finding of excessive corporal punishment, provided that the parent or caregiver could have foreseen, under all of the attendant circumstances, that such harm could result from the punishment inflicted.
>
> [413 N.J. Super. at 511].

We also stated a trial court should consider the following factors: "(1) the reasons underlying [the parent's] actions; (2) the isolation of the incident; and

(3) the trying circumstances which [the parent] was undergoing[.]" Id. at 512. The court should also "evaluate a claim of abuse by looking to the harm suffered by the child, rather than the mental state of the accused abuser, because '[t]he main goal of Title 9 is to protect children[.]'" Id. at 511 (quoting G.S., 157 N.J. at 176). "[A]bsent evidence showing that the inflicted injury constitutes per se excessive corporal punishment, we must examine the circumstances facing [the parent] to determine whether [the conduct] amounted to excessive corporal punishment." Id. at 512.

Here, there was ample evidence to support the finding the incident constituted per se excessive corporal punishment. Indeed, both L.A.O. and J.O. told the investigator the prior incidents of corporal punishment occurred were distant in time, infrequent, and never consisted of repeated blows and injury of the sort L.A.O. experienced the day of the incident. Moreover, under the K.A. factors, one incident is sufficient for a finding of excessive corporal punishment and we are unconvinced there was a valid reason to harm L.A.O. in such a fashion or that the circumstances justified the child suffer such a harm.[2]

---

[2] T.A.'s conduct also met the statutory definition of abuse because L.A.O.'s "physical . . . condition [was] impaired . . . as the result of . . . [her] parent or guardian . . . unreasonably inflicting . . . harm . . . ." N.J.S.A. 9:6-8.21(c)(4)(b).

III.

In Point III of T.A.'s brief, he argues the court erroneously referenced N.J.S.A. 9:6-1 and relied on its language defining "'cruelty' in arriving at its reasoning in support of a finding of child abuse in this matter." He claims the Division never "pled an action for abuse," and the judge's findings violated due process because he "was not on notice that he had to defend against allegations that his conduct amounted to abuse and neglect because it fell within the statute's broad definition of 'cruelty.'"

We have stated:

> At a minimum, due process requires that a party in a judicial hearing receive "notice defining the issues and an adequate opportunity to prepare and respond." . . . [D]ue process forbids the trial court "to convert a hearing on a complaint alleging one act . . . into a hearing on other acts[.]"
>
> [T.M.S. v. W.C.P., 450 N.J. Super. 499, 505 (App. Div. 2017) (quoting J.D. v. M.D.F., 207 N.J. 458, 478 (2011)) (citations omitted).]

Our review of the record demonstrates there was no mystery the Division sought a finding pursuant to N.J.S.A. 9:6-8.21(c)(4)(b). Indeed, the Division's complaint, the evidence presented, the direct and cross-examination of the witnesses, and the court's findings all addressed whether there was excessive corporal punishment as defined under the statute. Therefore, T.A. had notice

23

and an opportunity to defend the Division's claims. The trial judge's reference to N.J.S.A. 9:6-1 in her opinion did not constitute reversible error. R. 2:10-2. "[A]ppeals are taken from judgments, not opinions." Arons v. N.J. Network, 342 N.J. Super. 168, 181 (App. Div. 2001).

IV.

Finally, Point IV of the Law Guardian's argues this matter was better suited as a family crisis case under N.J.S.A. 30:4C-12, rather than an abuse or neglect matter under Title 9. We reject this contention.

"The Legislature charged the Division with the responsibility of protecting the health and welfare of the children of this state. N.J.S.A. 30:4C-4. The procedures for accomplishing those obligations are set forth in Title Nine, N.J.S.A. 9:6-8.21 to -8.73, and Title Thirty, N.J.S.A. 30:4C-11 to -14." N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009) (emphasis added). Although "the Division usually pleads Title 9 and Title 30 claims concurrently in order to facilitate the efficient processing of assistance to the family, particularly to the child who is the focus of the inquiry[,] . . . Titles 9 and 30 operate independently from one another." N.J. Dep't of Child. & Fams., Div. of Youth & Fam. Servs. v. I.S., 214 N.J. 8, 31, 37 (2013). And "the use of N.J.S.A. 30:4C-12 is not a substitute for an abuse and neglect proceeding[.]"

N.J. Div. of Youth & Fam. Servs. v. J.C., 423 N.J. Super. 259, 267 (App. Div. 2011).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5598-18